Filed 2/4/14  P. v. Williamson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E055227 |
| Plaintiff and Respondent, | (Super.Ct.No. SWF10000631 |
| v. | **ORDER MODIFYING OPINION** |
| DANIEL NATHAN WILLIAMSON, | **[NO CHANGE IN JUDGMENT]** |
| Defendant and Appellant. | |

Pursuant to appellant's letter filed January 30, 2014, the opinion filed in this matter on January 17, 2014, is modified as follows:

On page 2, beginning with line 4 of the first full paragraph, should read as follows: child under age 14 (counts 5-9 and 11-13; § 288, subd. (a)); and battery (§ 242; count 18). The court also found true the allegation as to counts 3 and 5 through 13, that the crimes were committed against multiple victims (§ 667.61, subd. (e)(5)).  The trial court sentenced defendant to 135 years to life in prison.

1

Except for this modification, the opinion remains unchanged. This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.

Filed 1/17/14  P. v. Williamson CA4/2 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055227 |
| v. | (Super.Ct.No. SWF10000631) |
| DANIEL NATHAN WILLIAMSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Alfred J. Wojcik, Judge.

Affirmed with directions.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

Defendant Daniel Nathan Williamson appeals from judgment entered following jury convictions for aggravated sexual assault (forcible oral copulation) of a minor under the age of 14 (count 3; Pen. Code, § 269, subd. (a)(4))[1]; lewd and lascivious conduct on a child under age 14 (counts 5-9 and 11-13; § 288, subd. (a)); continuous sexual abuse of a child (count 10; § 288.5); and battery (§ 242; count 18). The court also found true the allegation as to counts 3 and 5 through 13, that the crimes were committed against multiple victims (§ 667.61, subd. (e)(5)). The trial court sentenced defendant to 135 years to life in prison.

Defendant contends the trial court erred in denying his motion to suppress his post-arrest statement to the police, and there was insufficient evidence to support his conviction for count 3. Defendant also argues the trial court violated his constitutional rights by admitting evidence of his prior sexual offenses, and the multiple victim allegations should be reversed because the trial court directed the jury to reconsider its initial not true findings.

We conclude that, as to count 3, there was insufficient evidence of force and duress to support defendant's conviction for violating section 269, subdivision (a)(4). Therefore, the conviction on count 3 must be reduced to a conviction for the lesser included offense of violating section 288a, subdivision (c)(1), and remanded for

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

resencing. In all other respects, we affirm the judgment, there being no other prejudicial or cumulative error requiring reversal.

## II

## FACTS

In 2006, defendant met Sarah W. They married in 2007, when Sarah was around 20 years old and defendant was 30. Sarah had three biological sisters, Does 1, 2, and 3, and three stepsisters, Does 4, 5,[2] and 6. Sarah's six younger sisters lived with her father, Ra.D., and stepmother, Ro.D. Ra.D. shared custody of Does, 1, 2, and 3 with his ex-wife, K.D. From Christmas 2009, until Easter 2010, defendant sexually assaulted five of Sarah's sisters, four of whom were under the age of 14. At the time of trial in October 2011, Doe 1 was 14, Doe 2 was 10, Doe 3 was 12, Doe 4 was 15, and Doe 6 was 18.

In September 2009, Sarah and defendant moved with their infant son into an apartment with a pool and spa. K.D. and Does 1, 2, and 3 visited Sarah and defendant at their apartment. Sarah noticed defendant spent a lot of time with her sisters and got too close to them. K.D. noticed that defendant spent more time with Doe 1 than the other girls. In March 2010, K.D. found Doe 1 and defendant lying under a blanket on the living room floor.

On Easter, April 4, 2010, Sarah and defendant visited K.D. and Ra.D. Defendant sat next to Doe 4 in the TV room and touched her leg. When Doe 4 told him to stop, defendant sat next to Doe 6. Doe 6 testified that, while she was playing a game on her

---

[2] Because defendant was found not guilty of charges involving Doe 5, only limited facts regarding her are included in this opinion.

3

laptop computer, defendant sat next to her, laid a blanket over her lap, and played with her foot under the blanket. Then he rubbed her inner thigh, up to about two inches from her "private area." Doe 6 stopped playing her computer game and went upstairs because defendant made her feel "[u]ncomfortable and creeped out." Doe 4 also left the room. After defendant and Sarah went home that day, Doe 4 and 6 told Ra.D. what defendant had done to them. RaD. asked his other daughters whether defendant had done anything to them. Each said he had. After calming down the girls, RaD. and K.D. called the police and reported defendant's conduct.

On April 6, 2010, Katie Heibert of Riverside Child Assessment Team (RCAT) interviewed each of the six girls. Two days later, Doe 6 made a pretext call to defendant. During the call, defendant apologized to Doe 6 for rubbing her leg on Easter. That same day, the police arrested defendant, advised him of his *Miranda*[3] rights, and transported him to the police station. The police also searched defendant's home. About an hour after defendant's arrest, police detectives interviewed defendant at the police station. Defendant acknowledged he had recently been advised of his *Miranda* rights and agreed to waive them and talk to the officers. During his recorded interview, defendant admitted sexually abusing his wife's sisters. After the interview, defendant wrote a letter to Doe 1, apologizing for touching her.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

*A. Doe 1 (Counts 1 through 10)*

According to Maria Hughes, the school psychologist who assessed Doe 1's cognitive abilities, Doe 1 had "mild mental retardation," which qualified her for special education. According to Hughes, this meant she had the least severe form of mental retardation. Doe 1 was able to function in society and had been mainstreamed in some of her classes. Doe 1 was identified as having a learning disability but not a developmental disability. In some cognitive areas, Doe 1 showed mental development approaching that of a normal child her age but in the majority of areas, she was less developed than a normal child, particularly in the area of understanding requests made of her and the ability to communicate her desires. Doe 1 qualified for special education services for speech and language impairment but not for mental retardation or brain injury.

On Easter 2010, and before then, when Doe 1 was 11 or 12 years old, defendant touched Doe 1 in inappropriate places ("wrong spots") numerous times, including in the genital area several times and on her breasts three or four times.

The following facts are from Doe 1's recorded statement, taken on April 6, 2010, and her trial testimony.

*Counts 1 and 2*

Defendant inserted his penis in Doe 1's vagina while she was sitting on his lap in a Jacuzzi at defendant's apartment. He forced her to do it even though she did not want to. Defendant lifted Doe 1's body up and down. Doe 1 was scared of defendant because he was bigger than her, she was a child, and defendant was an adult.

5

*Counts 3 and 4 (Oral Copulation against Doe 1)*

The same day as the Jacuzzi incident, while Doe 1 and defendant were in his apartment playing on the computer in the bedroom, defendant licked Doe 1's genital area. Doe 1 was scared when he did it. She did not try to push him away or object. Doe 1 testified that defendant forced her. She testified this meant she did not want to do it. She also testified defendant did not physically force her or threaten her. Other than when she eventually reported the incident, Doe 1 did not tell anyone about the incident because she was afraid of defendant and afraid to tell anyone.

*Count 5*

On Christmas 2009, Doe 1 and defendant played a video game upstairs, while the rest of the family was downstairs. Defendant digitally penetrated Doe 1's vagina with one hand while playing the video game with his other hand. Defendant said to Doe 1, "You feel so good." Defendant told her not to tell anyone. Doe 1 did not tell anyone until April 5, 2010, when she told her sisters, who told her parents. She did not tell anyone before that because she was scared she would get in trouble.

*Count 7*

Defendant penetrated Doe 1's vagina when she was at defendant's apartment, sitting next to him on the couch under a blanket, while watching a movie. Doe 1 did not tell defendant to stop because she was scared.

*Count 8*

On another occasion at Doe 1's mother's house, defendant forced Doe 1 to sit on his lap, on the couch. She did not want to do it. Defendant pulled her onto his lap and

6

covered himself and Doe 1 with his jacket.  Defendant then inserted his finger into Doe 1's vagina.

*Counts 6 and 9*

Doe 1 saw defendant's penis twice.  Both times she was at defendant's apartment. He made her hold it and squeeze it with her hand.  Another time, defendant squeezed white liquid out of his penis and rubbed the liquid on her lips.

*B.  Counts 11 through 18, involving Does 2, 3, 4, 5, and 6*

Because defendant is not challenging the sufficiency of evidence as to counts 11 through 18, the following is only a brief summary of evidence relating to the other charges involving Does 2, 3, 4, and 5, and misdemeanor battery involving Doe 6.

*Count 11 (Doe 2)*

While Doe 2 was at defendant's apartment, sitting on the living room couch in her bathing suit, playing a computer game, defendant suddenly touched her leg with his hand. Doe 2 told defendant, "Don't touch me right there."

*Count 12 (Doe 3)*

When Doe 3 was around 11 years old, defendant touched her "butt and [her] private part."  Doe 3 was upstairs at Ra.D.'s home watching Doe 5 play video games. Doe 3 was lying on her stomach on the floor and defendant was lying next to her.  When defendant touched her, Doe 3 told him to "stop it," got up, and walked away.

*Count 13 (Doe 4)*

On Christmas 2009, while defendant and Does 1 and 4 were in Ra.D.'s backyard, defendant told Does 1 and 4 they were thin and his favorites.  He placed his hand on Doe

7

4's back, underneath Doe 4's shirt.  Defendant moved his hand down Doe 4's back and swept his finger across her right buttocks, under her jeans.  This made Doe 4 nervous.  She told him she was thirsty and left.

*Counts 14, 15, 16 and 17 (Doe 5)*

While defendant and Doe 5 were at the park with the rest of the family on Christmas 2009, defendant climbed up a tube slide behind Doe 5 and touched her buttocks.  Doe 5 was 13 years old.

Several months later, on Easter, while Doe 5 and her sisters were playing Play Station, Doe 5 saw defendant pull out his penis and show it to Doe 1.  Later that day, Doe 5 put her legs up on the backyard patio table.  Defendant started touching her hip.  Doe 5 pushed defendant's hand away but he put it back.  Doe 5 then walked away.  A little later, when the family was in the kitchen saying grace with their eyes closed before dinner, defendant touched the side of Doe 5's breast.  Doe 5 moved away from defendant.

*Count 18 (Doe 6)*

While at Ra.D.'s home on Easter 2010, defendant sat next to Doe 6 while she was playing a computer game on her laptop.  Defendant placed a blanket over Doe 6 and himself, rubbed the inner part of Doe 6's thigh, within two inches of her genitalia.  Doe 6 left the room because the touching made her feel uncomfortable.

III

VALID *MIRANDA* WAIVER

Defendant contends the trial court erred in denying his motion to suppress his recorded statement made to the police.  Defendant argues the police obtained his

8

statement in violation of *Miranda* and his constitutional rights to counsel and due process, and against self-incrimination. We conclude there was no error in denying defendant's motion.

*A. Procedural Background*

When defendant was arrested for molesting his wife's younger sisters in April 2010, Murrieta Police Detective Whittington read defendant his *Miranda* rights. Whittington told defendant that Detective Dorcas, who was nearby on the telephone, was in charge of investigating the criminal allegations against defendant and would be contacting defendant to ask him questions. Whittington thereafter told Dorcas he had advised defendant of his rights, defendant understood and waived his rights, and defendant was willing to talk.

Police Officers Stotts and Swearingen transported defendant to the police station. Meanwhile Whittington and Dorcas went to defendant's house. Dorcas spoke to defendant's wife and seized property. Defendant was not questioned until Dorcas and Whittington interviewed him at the police station about an hour and a half after defendant's arrest. During the first 10 minutes of the interrogation, Dorcas, Whittington, and defendant talked about defendant's employment as a security guard, his military career, and his arm injury. Before questioning defendant about the sexual abuse crimes, Dorcas reminded defendant that Whittington had previously read him his *Miranda* rights. Defendant said he remembered them. Thereafter the following recorded discourse took place between defendant, Dorcas and Whittington:

"[Dorcas]:  So keeping your rights in mind, do you want to talk to us about what's going on?

"[Defendant]:  Umm . . . is there a chance I could talk with legal representation?  Because I don't know.  I don't know how this will play out.

"[Dorcas]:  Yeah, if you want to.  Is that what you're asking for?

"[Defendant]:  Umm, what is, what is that option?  Is, when, when it comes to . . .

"[Dorcas]:  Remember your rights?  Your right to an attorney before, during and after questioning.

"[Defendant]:  Yes.

"[Unidentified speaker]:  So it's up to you.

"[Whittington]:  Basically, we have a certain set of statements and the reason why we want to talk to you is get your, your side of the story.  But if, you know, and it's completely up to you but, if you decide to talk to an attorney first, we're not gonna get your side of the story and we just kinda go with what we have.  'Cuz if you decide you want an attorney we're just, you just get transported and just gets played out from there through court.

"[Dorcas]:  So it's really up to you.  Like he said, we have their side. . .

"[Defendant]:  But if I, I say anything and that could [be] used against me in a court of law.

"[Dorcas]:  Right.

"[Defendant]:  So it won't help me, it'll actually go against me.

"[Dorcas]:  Well, depends what you have to say.

"[Whittington]: Yeah, a lot of it depends on how truthful you want to be.

"[Dorcas]: I mean, we know . . . we gotta get your side or we try to get your side, otherwise we'll just stay with what we know and we'll go from there. It's your chance to clear the air and tell us your side of the story. But it's up to you.

"[Defendant]: I want to be honest.

"[Dorcas]: Well, it's good to be honest.

"[Defendant]: I just, I don't . . . well, I guess I'll just tell you then.

"[Dorcas]: Okay, so you're willing to talk to us?

"[Defendant]: I would, I would assume that's probably the best, best way to go.

"Dorcas]: Okay. Alright, well why do you think you're here today?

"[Defendant]: Because I have, umm, I, I fondled one of my . . . I guess it'd be sister-in-law, younger sister-in-law."

During the remainder of defendant's recorded interview, which lasted over an hour, he admitted to inappropriately touching all six of his victims. He denied, however, committing lewd conduct against Doe 5. Defendant also denied penetrating Doe 1's vagina with his penis and orally copulating her in his apartment. Defendant, however, admitted oral copulating Doe 1 in the pool. At the end of defendant's interview, defendant wrote an apology letter to Doe 1.

On May 3, 2011, defendant filed a motion to suppress his recorded statement on the grounds the interview violated his rights to remain silent and to an attorney. Defendant argued Dorcas and Whittington improperly continued to question him after he invoked his right to counsel. After hearing Whittington's testimony and reviewing

11

defendant's recorded statement and transcription, the trial court denied defendant's motion to suppress on the ground defendant was properly advised of his *Miranda* rights and waived them. The court also found that defendant did not make an unambiguous or unequivocal request for counsel and, when defendant waived his rights to remain silent and to an attorney, the police did not place defendant under duress or coerce him to waive his rights.

*B. Applicable Law and Analysis*

The Supreme Court held in *Miranda, supra,* 384 U.S. 436, that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence in order to protect the privilege against self-incrimination. The Supreme Court in *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485, further held: "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." "This 'second layer of prophylaxis for the *Miranda* right to counsel,' [citation], is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights,' [citation ]." (*Davis v. United States* (1994) 512 U.S. 452, 458 (*Davis*), quoting *McNeil v. Wisconsin* (1991) 501 U.S. 171, 176 and *Michigan v. Harvey* (1990) 494 U.S. 344, 350.)

To make an effective invocation of the right to counsel, "the suspect must unambiguously request counsel." (*Davis, supra,* 512 U.S. at p. 459.) "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable

12

officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. [Citation.]" (*Id.* at p. 459.) "[W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." (*Id.* at p. 461; see also *People v. Williams* (2010) 49 Cal.4th 405, 428 (*Williams*).)

"It is the function of the trial judge to determine whether the defendant did in fact knowingly and voluntarily waive his right to remain silent and his right to have the assistance of counsel. This determination is to be made based on the totality of the circumstances surrounding the interrogation. [Citations.] The assertion of privilege or its waiver constitutes a question of fact which can only be decided after taking into account the special circumstances of each case. [Citation.]" (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 526 (*Bestelmeyer*).)

Here, defendant does not dispute that, at the time of his arrest, Whittington properly advised him of his *Miranda* rights and defendant waived them. Defendant argues, however, that later at the police station, at the outset of his recorded interrogation, he invoked his right to an attorney and therefore all subsequent questioning by the police violated his rights to counsel and to remain silent. We disagree. Defendant did not unequivocally request an attorney. He asked Dorcas, "is there a chance I could talk with legal representation? Because I don't know. I don't know how this will play out."

Pondering whether or not to request an attorney and requesting clarification regarding the right to an attorney is not an invocation of the right. (*Bestelmeyer, supra,*

13

166 Cal.App.3d at pp. 526–527.) In response to defendant's inquiry, Dorcas told defendant he could speak to an attorney, and then asked for clarification: "Is that what you're asking for?" Dorcas reminded defendant that he had a "right to an attorney before, during and after questioning." Defendant confirmed that he remembered he had this right and acknowledged that he was aware that if he said anything, it could be used against him in court and would not help him. Defendant ultimately decided that he wanted to be honest and tell the police his side of the story. Defendant then proceeded to answer questions about the alleged crimes.

Under these circumstances, Dorcas appropriately clarified defendant's ambiguous response in which defendant inquired whether it might be possible to talk to an attorney. We conclude ". . . it does not appear that the officers were 'badgering' defendant into waiving his rights; his response reasonably warranted clarification." (*Williams, supra,* 49 Cal.4th at p. 429.) Although Dorcas clearly reiterated that defendant had a right to an attorney and could speak to an attorney, defendant equivocated. When Dorcas asked defendant if he wanted an attorney, defendant did not say yes. He ultimately said he had decided it would be best to be honest and tell his side of the story. The transcript of Dorcas, Whittington, and defendant's discussion of defendant's right to an attorney shows that defendant considered requesting an attorney but ultimately, voluntarily decided to proceed with giving a recorded statement without an attorney.

We conclude there was substantial evidence to support the trial court's findings that defendant knowingly waived his right to counsel and voluntarily made the

subsequent statements to the investigation officers.  (*Bestelmeyer, supra,* 166 Cal.App.3d at p. 528.)

IV

SUFFICIENCY OF EVIDENCE

Defendant contends there was insufficient evidence to support his conviction on count 3 for aggravated sexual assault (forcible oral copulation; § 269, subd. (a)(4)).

*A.  Applicable Law*

We are limited in our review of a claim of insufficiency of the evidence.  "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."  [Citations.]'  [Citations.]"  [¶]  "Given this court's limited role on appeal, defendant bears an enormous burden in claiming there is insufficient evidence to sustain his molestation convictions.  If the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves.  [Citation.]"  (*People v. Veale* (2008) 160 Cal.App.4th 40, 45-46 [Fourth Dist., Div. Two] (*Veale*).)  Applying this standard of review, we conclude there was insufficient evidence to support defendant's count 3 conviction.

The elements of aggravated sexual assault of a child, as alleged in count 3, are: (1) the defendant committed oral copulation in violation of section 288a, subdivision

15

(c)(2) or (3), or subdivision (d); (2) the victim was under 14 years of age; and (3) the alleged victim was seven or more years younger than the perpetrator.  (§ 269, subd. (a)(4).)

The trial court instructed the jury on the elements of forcible oral copulation (§ 288a) in relevant part as follows:  "In order to prove this crime, each of the following elements must be proved:  [¶]  1.  A person participated in an act of oral copulation with an alleged victim; [and] [¶]  2.  The act was accomplished against the alleged victim's will by means of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the alleged victim or any other person."  (CALJIC No. 10.10.)

## B.  Evidence of Force or Violence

Defendant argues there was insufficient evidence he committed oral copulation against Doe 1 through the use of "force, violence, duress, menace or fear."  (§ 288a, subd. (c)(2)(B).)  We agree.

The trial court instructed the jury that "[t]he 'force' required as an element under Counts 1 and 3 means physical force substantially different from, or substantially in excess of, that required for the commission of the act of sexual intercourse and/or the act of oral copulation."  Such physical force must be "substantially different from or substantially greater than that necessary to accomplish the lewd act."  (*People v. Griffin* (2004) 33 Cal.4th 1015, 1026; *People v. Guido* (2005) 125 Cal.App.4th 566, 575.)  "[O]ral copulation by force within the meaning of section 288a, subdivision (c)(2) is proven when a jury finds beyond a reasonable doubt that defendant accomplished an act

16

of oral copulation by the use of force sufficient to overcome the victim's will." (*Guido*, at p. 576.)

In the instant case, there was insufficient evidence of force or violence. Doe 1 testified at trial that, while Doe 1 and defendant were in his apartment playing on the computer in the bedroom, defendant orally copulated Doe 1. Doe 1 was scared when he did it. When asked during the trial if defendant did anything to get her to allow him to commit oral copulation against her, Doe 1 testified: "He forced me." Doe 1 said this meant, "I didn't want to do it," "He made me do it." When asked what Doe 1 meant when she said he made her do it, Doe 1 replied, "Made me do something that I didn't want to do because it wasn't the right thing to do." Doe 1 was asked if defendant did anything else physically to touch or hold her while he committed oral copulation against her. Doe 1 replied, "I don't know." When later asked again if defendant physically did anything to her to make her let him orally copulate her, Doe 1 said, "don't think so." Doe 1 also testified she did not tell defendant not to orally copulate her, push him away, or try to prevent him from doing what he was doing.

During cross-examination, Doe 1 acknowledged that when she used the word, "force," she was not referring to physical force. Rather, she meant defendant did something she did not want him to do. She could have said "no" to defendant when he committed oral copulation against her but she chose not to say anything or do anything. She did not try to leave. Doe 1 further acknowledged that defendant did not threaten her. He did not tell her he was going to hurt her and did not use any force or violence against her.

17

Even though Doe 1 initially testified that defendant forced her to submit to oral copulation, during cross-examination her testimony clarified that, what she meant was that defendant did something to her that she did not want him to do but passively complied with his unwanted acts. Doe 1's testimony established that defendant did not use any physical force or violence or verbal threats when orally copulating Doe 1.

## C. Evidence of Duress

The prosecution alternatively argued that defendant committed oral copulation against Doe 1 through the use of duress. ""Duress" has been defined as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." . . . [D]uress involves psychological coercion. Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. . . . "Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim" [are] relevant to the existence of duress.' [Citation.]" (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319-1320 (*Espinoza*), quoting *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.) "'Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family.' [Citations.]" (*Veale, supra,* 160 Cal.App.4th at p. 46,

18

quoting *People v. Cochran* (2002) 103 Cal.App.4th 8, 14; see also *People v. Senior* (1992) 3 Cal.App.4th 765, 775 and *People v. Schulz, supra,* 2 Cal.App.4th at p. 1005.)

The People rely on this court's decision in *Veale, supra,* 160 Cal.App.4th 40, for the proposition there was sufficient evidence of force and duress to support the defendant's conviction. In *Veale*, the defendant committed numerous lewd acts upon his seven-year-old stepdaughter. The victim said she was afraid of the defendant but could not say why. She also feared that if she reported the defendant's conduct, the defendant would kill her or her mother, although the defendant never told her he would do so. A couple of times the victim objected to the defendant molesting her. The defendant relented and did not make the same requests again. The victim testified at trial that the defendant did not threaten her or use physical force. The defendant in *Veale* argued on appeal that there was no evidence he used force or duress.

This court concluded in *Veale* that, based on evidence of these facts, there was sufficient evidence of duress. (*Veale, supra,* 160 Cal.App.4th at p. 47.) We explained in *Veale*, that "A reasonable inference could be made that defendant made an implied threat sufficient to support a finding of duress, based on evidence that Brianna feared defendant and was afraid that if she told anyone about the molestation, defendant would harm or kill Brianna, her mother or someone else. Additional factors supporting a finding of duress include Brianna's young age when she was molested; the disparity between Brianna and defendant's age and size; and defendant's position of authority in the family. The totality of this evidence was sufficient to support a finding that defendant molested Brianna by means of duress, in violation of section 288, subdivision (b)." (*Veale,* at p. 47.)

19

The instant case is distinguishable from *Veale*. Here there was no evidence supporting a finding defendant committed forcible oral copulation by means of a direct or implied threat. Although there was evidence that perhaps on another occasion Doe 1 told defendant not to touch her in the future, there is no evidence that Doe 1 objected to or resisted defendant's act of molesting her when he committed the instant offense. There is also no evidence Doe 1 feared that if she reported the molestation, defendant would kill her, her mother, or another family member. In addition, Doe 1 was four years older than the seven-year-old victim in *Veale*, although in the cognitive areas of speech and language, Doe 1's abilities may have been at about the same age level as those of the victim in *Veale*.

The evidence further demonstrates that, although Doe 1 had a learning disability relating to speech and language, her disability was not severe. Doe 1 was capable of comprehending that what defendant was doing to her was wrong. In addition, unlike in *Veale*, the relationship between Doe 1 and defendant was not of a parental nature. Defendant was Doe 1's older brother-in-law. His relationship with Doe 1 was similar to that of a visiting uncle and niece. Defendant did not live with Doe 1's family. There is no evidence that, as a visiting relative, he held a position of parental authority over Doe 1.

The instant case is more analogous to *Espinoza, supra,* 95 Cal.App.4th 1287, relied on by defendant for the proposition that there was insufficient evidence of duress because there was no evidence Doe 1's participation was impelled by defendant making direct or implied threats. (*Id.* at p. 1321.) In *Espinoza*, the defendant was convicted of

20

forcible lewd conduct (§ 288, subd. (b)). The defendant began molesting his biological daughter shortly after she moved in with him. The victim was 12 years old and in special education classes. She was described as not as "bright" as her sisters and had difficulty concentrating. The *Espinoza* court reversed the trial court conviction, finding there was insufficient evidence of duress because of the lack of any direct or implied threat. (*Espinoza,* at pp. 1321-1322.)

Although the defendant in *Espinoza* was convicted of committing forcible lewd conduct, whereas the instant case concerns forcible oral copulation, *Espinoza* is instructive because both offenses require the same finding of force or duress. Here, as in *Espinoza*, Doe 1 was molested by a relative who was much larger in size and older than her. In addition, Doe 1 had limited mental ability, as did the victim in *Espinoza*, and both victims said they were scared and did not resist.

The *Espinoza* court explained there was insufficient evidence of duress: "The only way that we could say that defendant's lewd act on L. and attempt at intercourse with L. were accomplished by duress is if the mere fact that he was L.'s father and larger than her combined with her fear and limited intellectual level were sufficient to establish that the acts were accomplished by duress. What is missing here is the '"direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted."' [Citation.] Duress cannot be established unless there is evidence that 'the victim['s] participation was impelled, at least partly, by an implied threat . . . .'

21

[Citation.] No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind. While it was clear that L. was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Espinoza, supra,* 95 Cal.App.4th at p. 1321.)

The *Espinoza* court noted that, "[T]he Legislature has recognized that all sex crimes with children are inherently coercive." (*Espinoza, supra,* 95 Cal.App.4th at p. 1321.) As with section 288, subdivision (b), the Legislature enacted subdivisions (c) and (d) of section 288a, in recognition that "defendants who compound their commission of such acts by the use of violence or threats of violence should be singled out for more particularized deterrence.' [Citation.]" (*Espinoza, supra,* 95 Cal.App.4th at p. 1321, quoting *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1250-1251.)

Here, as in *Espinoza*, there was no evidence in the record that defendant used any direct threats when committing oral copulation against Doe 1. The People argue the following evidence, however, was sufficient to support a finding that defendant used implied threats: Doe 1 suffered from mild mental retardation, making her more susceptible to coercion through fear; defendant's relationship with Doe 1 was like that of an uncle, since defendant was 20 years older than Doe 1; Doe 1 was 11 years old; Defendant was 6'6" and over 200 pounds; defendant sexually abused Doe 1 on numerous occasions; on one occasion, defendant told Doe 1 not to tell anyone what he had just

22

done; and Doe 1 testified that she was scared when defendant orally copulated her. Defendant admitted knowing that when he sexually abused Doe 1, she did not want defendant to touch her. We conclude there is no evidence establishing duress by implied threat. There were no threats, direct or implied, that Doe 1 would suffer adverse consequences if she did not acquiesce to defendant's acts of sexually abusing Doe 1.

When denying defendant's motion for acquittal under section 1118.1, the trial court stated it found there was sufficient evidence of force and duress to support a conviction on count 3, based on evidence Doe 1's mental disability affected her ability to learn. Specifically, it prevented her from perceiving fully what was happening when defendant molested her. She appeared to be slow mentally and did not have the degree of understanding one would expect of someone her age. The court therefore concluded Doe 1 was unable to consent knowingly and voluntarily to defendant's acts.

But evidence of Doe 1's mental disability, as described by the school psychologist, was insufficient to establish duress. There must also be evidence of a direct or implied threat, and there was no such evidence. Although the evidence established that Doe 1 was mentally slow for someone her age, the evidence also demonstrated she understood that what defendant did was wrong and did not want him to do it. She nevertheless was passive. Defendant did not resort to threats or physical force when committing count 3 or the other offenses, other than using a limited amount of force required to commit the sexual crimes in question.

The People argue there was evidence of duress based on defendant molesting Doe 1 on numerous occasions and using force during several of the incidents, including an

23

incident occurring before the oral copulation incident, on the same day, when defendant and Doe 1 were in the Jacuzzi (counts 1 and 2). During this incident, defendant allegedly inserted his penis in Doe 1's vagina while she was sitting on his lap in a Jacuzzi at defendant's apartment. Defendant lifted Doe 1's body up and down. The jury did not find defendant guilty of this incident (counts 1 and 2), and the force used to commit the offense was inherent in committing the sexual offense, rather than to overcome resistance by Doe 1.

The prosecution also argued there was evidence defendant used force when he made Doe 1 hold his penis and squeeze it with her hand (counts 6 and 9; lewd and lascivious conduct on a child under age 14). Again, this force was inherent in committing the sexual offense, rather than to overcome resistance by Doe 1. Because Doe 1 did not resist defendant's sexual acts, the force used by defendant, if any, was limited to that required to commit the sexual acts against Doe 1. As in *Espinoza*, the only way that we could say that defendant's act of orally copulating Doe 1 was accomplished by duress is if the mere fact that defendant was a close relative and larger and older than her, combined with her fear and limited intellectual level "were sufficient to establish that the acts were accomplished by duress. What is missing here is the '"direct or implied threat of force, violence, danger, hardship or retribution. (*Espinoza, supra,* 95 Cal.App.4th at p. 1321.)

Here, no evidence was adduced that defendant's oral copulation against Doe 1 was accompanied by any direct or implied threat of any kind. Although Doe 1 said she was scared when defendant sexually abused her, "no evidence was introduced to show that

24

this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Espinoza, supra,* 95 Cal.App.4th at p. 1321.)

Because there was insufficient evidence that defendant committed oral copulation against Doe 1 by means of force, violence, duress, menace or fear of immediate, unlawful bodily injury, defendant's section 269, subdivision (a)(4), conviction for forcible oral copulation must be reduced to reflect a conviction of the lesser included offense of nonforcible oral copulation under section 288a, subdivision (c)(1). (*Espinoza, supra,* 95 Cal.App.4th at p. 1321; *People v. Kelly* (1992) 1 Cal.4th 495, 528.)

V

PRIOR SEXUAL OFFENSE EVIDENCE

Defendant contends the trial court committed prejudicial error by allowing evidence of his prior uncharged sexual acts. He argues the prior acts did not qualify as sexual offenses under Evidence Code section 1108 and therefore the evidence was inadmissible character evidence under Evidence Code section 1101, subdivision (a). We disagree.

A. *Procedural Background*

The People filed a motion in limine to admit under Evidence Code section 1108 defendant's recorded statement to the police admitting that he was involved in the following four unreported prior sexual incidents: (1) In 1997, when defendant was 22 years old, he touched two young girls while he was on a missionary trip; (2) he had

25

sexual relations with his sister when he was 15 years old; (3) he had sexual relations with his cousin when he was 15 years old; and (4) he had sexual relations with his adult sister-in-law, Christina. The People argued that evidence of these prior offenses demonstrated that defendant had a substantial history of committing sexual assaults.

Defendant filed a motion in limine requesting the court to exclude this evidence. Defendant asserted that Christina would testify that he sexually assaulted her in Las Vegas when she was 21 years old. The incident was never reported to law enforcement and was not revealed until the prosecution of defendant in the instant case. During defendant's recorded statement to the police, he admitted to a consensual sexual relationship with Christina prior to his marriage to Sarah. As to the other three incidents, defendant argued that his admissions made in his recorded statement to the police did not provide a sufficient basis for allowing evidence of the acts. There was no independent evidence of the incidents and the "corpus delicti" of the offenses could not be proved by a preponderance of the evidence.

During the hearing on the motions in limine, defense counsel objected to the evidence of the prior sexual acts on the ground there was insufficient evidence establishing that the four incidents qualified as sex offenses under Evidence Code section 1108. The trial court concluded the evidence was admissible because the evidence constituted admissions of the prior criminal acts. Defense counsel inquired as to what sexual offenses were actually committed when defendant committed the four prior offenses. The court said the acts might constitute lewd and lascivious acts but deferred discussing the matter further until later, when the jury instructions were discussed.

26

At trial, Christina did not testify. Defendant's recorded statement was admitted under Evidence Code section 1108 and played for the jury. Defendant admitted in his recorded statement that he "fooled around" with Christina but claimed it was mutually consensual. When asked if defendant had committed inappropriate touchings of any girls under 18, other than Does 1 through 6, defendant admitted "mess[ing] around" with his sister and his cousin when he was 15 years old and had been taking sex education in high school. He and his sister, and later his cousin, were receptive to "fooling around with one another." The next time "that something like this occurred" was when he was 22 years old, on a church mission in the West Indies. He was staying at a home of missionaries who had two young girls who ran around "smacking everybody on the butt constantly." When the oldest girl smacked defendant, he put her over his knee, pulled down her pants, and "smack[ed] her butt a whole bunch of times. She freaked out."

At the end of the trial, during a discussion of the proposed jury instructions, the trial court noted that there was no evidence establishing the age of the four females involved in the prior touching incidents. The court therefore believed the jury could not consider any of defendant's admissions as prior uncharged acts of lewd and lascivious conduct with a child under the age of 14. The court therefore suggested giving an instruction admonishing the jury not to consider the evidence of defendant's prior uncharged misconduct.

Defense counsel requested the court to give the following special instruction: "The Prosecution introduced evidence that the defendant engaged in sexual conduct other than that charged in this case. The Prosecution has the burden of proving that the

27

defendant engaged in this other conduct by a preponderance of the evidence. The Prosecution has not met this burden. Therefore, you must disregard any evidence that the defendant engaged in sexual conduct other than that charged in this case. You must treat it as though you had never heard of it and not consider this evidence for any purpose."

The trial court rejected defendant's proposed instruction, and gave the following instruction: "You must disregard any evidence that the defendant engaged in sexual conduct other than that charged in this case. You must treat it as though you had never heard of it and not consider this evidence for any purpose."

B. *Admissibility of Prior Acts Evidence*

As a general rule, evidence of a defendant's conduct is not admissible to show disposition or propensity, but is admissible to prove identity, plan, intent, knowledge, or opportunity. (§ 1101.) Section 1108 provides a statutory exception, allowing propensity evidence to be admitted in sex offense cases to show a defendant is more likely to have committed the charged offense. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Section 1108, subdivision (d)(1), defines a sex offense as a crime under state or federal law that involves certain enumerated sexual acts and crimes. If the uncharged conduct qualifies as a sex offense, it is admissible subject to section 352. (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1315.) The trial court weighs the probative value against the potential risk of prejudice, confusion, and undue consumption of time. (*Ibid.*) On appeal, we review the trial court's ruling for an abuse of discretion. (*Ibid.*)

In the instant case, after the parties submitted on the evidence, the trial court correctly concluded that there was insufficient evidence establishing that defendant's

28

prior uncharged acts of touching four females qualified as sexual offenses under section 1108, since there was no evidence of the age of the females. The sexual offense of committing a lewd act in violation of section 288, requires a finding that the victim was under the age of 14 years. In addition, there was insufficient evidence the prior acts qualified as sexual offenses, since defendant did not specify in his recorded statement the nature of his acts as to his sister and cousin. Also, defendant claimed in his recorded statement that his sexual activity with Christina was consensual, and Christina did not testify to the contrary. The prior uncharged acts evidence therefore was inadmissible under Evidence Code sections 1101 and 1108.

*C. Harmless Error*

Defendant argues that allowing the inadmissible prior acts evidence constituted prejudicial error because the evidence would have confused the issues and unfairly distracted the jury from its consideration of the charged offenses. Defendant asserts that the evidence was damaging to defendant because this was a close case, and the propensity evidence showed that he was unfaithful to his wife and had a long history of sexually "fooling around," including with his own family members.

We conclude it is not reasonably probable that, had the evidence of defendant's prior uncharged sexual acts been excluded, there would have been a more favorable result. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The trial court appropriately instructed the jury that the prior uncharged sexual acts evidence should be disregarded. Under Evidence Code section 403, subdivision (c), "If the court admits the proffered evidence under this section, the court: [¶] (1) May, and on request shall, instruct the jury

29

to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist. [¶] (2) Shall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact exists."

In accordance with Evidence Code section 403, subdivision (c)(2), the trial court instructed the jury not to consider any evidence that "defendant engaged in sexual conduct other than that charged in this case. You must treat it as though you had never heard of it and not consider this evidence for any purpose." It is presumed the jury properly followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

In addition, there was overwhelming evidence supporting defendant's convictions, including the victims' testimony, the victims' RCAT statements, and defendant's recorded statement, admitting he had inappropriately touched Does 1, 2, 3, 4, and 6, and committed lewd acts, oral copulation, and digital penetration. Also, the prior uncharged acts were, in most instances, less egregious than the charged acts and, as a whole, were not likely to have been inflammatory or changed the jury's view of defendant, in light of the evidence of the seriousness of the crimes defendant committed.

VI

CONTINUATION OF JURY DELIBERATIONS

Defendant contends the trial court improperly directed the jury to reconsider its findings that the multiple victim enhancement allegations attached to counts 3 and 5 through 13, were untrue. We disagree.

30

*A. Procedural Background*

The jury found defendant guilty of committing lewd and lascivious acts against Does 1, 2, 3, and 4, and also forcible oral copulation against Doe 1. After the court clerk announced the jury verdicts and related allegation findings, the prosecutor asked the court to poll the jury on its allegation findings rejecting the multiple victim allegations. The prosecutor noted that the guilty verdicts involved multiple victims, and this was inconsistent with the jury's related allegation findings that there were not multiple victims (§ 667.61, subd. (e)(5)).

In response, the trial court reread to the jury the instruction for the multiple victim allegation. The trial court further told the jury: "What the People . . . is suggesting [is] that the verdicts seem to be inconsistent. In other words, you made a finding that there was not more than one victim. And [the prosecutor] is taking the position that's inconsistent because that same exact crime – the 288, subparagraph (a) – we had guilty verdicts on four Jane Does. So logic would seem to dictate there are more than one victim. [¶] Now maybe there was something in the proof that you did not accept regarding that."

The jury foreman told the court that the jury misunderstood the instruction: "The way we understood it is that it was more than one person at the time of the incident against Jane Doe. So I think all of us were under the impression that while Jane Doe was being victimized, someone else was being victimized at the same time . . . ." The trial court asked the jury foreman whether he would suggest that the jurors reconsider the multiple victim findings. The jury foreman indicated that, because the jury misconstrued

31

the instruction on the multiple victim allegations, the jury needed to reconsider its decision.

After noting that the trial court had not yet recorded the verdict, the court asked several other jurors if they were confused about the multiple victim enhancement. Several jurors stated that, as stated by the foreman, they misconstrued the enhancement as requiring a finding of multiple victims during the commission of the particular charged crime.

After clarifying that the enhancement merely required a finding that defendant had committed crimes against multiple victims, the trial court polled the jury as to whether their findings on the multiple victim allegations were true and correct. All of the jurors stated that their findings on the multiple victim allegations were not true and correct. The court found the jury had made an honest error regarding the multiple victim allegations and therefore sent the jury back to reconsider the allegations. Defense counsel objected to the entire manner in which the trial court addressed the inconsistency between the multiple victim allegations and verdicts. Later that same day, after reconsidering the enhancements, the jury found true the multiple victim allegations, contrary to its previous findings rejecting the allegations. The trial court denied defendant's motion to dismiss the judgment on the ground the trial court should have accepted the original not true findings on the multiple victim allegations.

B. *Applicable Law and Analysis*

Section 1161 provides that if there is a verdict of *conviction* and the court thinks the jury may have mistaken the law, the court may explain its reasons to the jury and

32

direct it to reconsider the verdict; "'but *when there is a verdict of acquittal, the Court cannot require the jury to reconsider it.*'" (*Bigelow v. Superior Court* (1989) 208 Cal.App.3d 1127, 1133 (*Bigelow*).) Although the jurors rendered not true verdicts on enhancement allegations, rather than acquittal verdicts on charges of substantive offenses, the two are equivalent for purposes of applying section 1161 to this case. (*People v. Guerra* (2009) 176 Cal.App.4th 933, 941, fn. 2 (*Guerra*).)

In *Bigelow, supra,* 208 Cal.App.3d at page 1129, the court held that the trial court erred in sending the jury back to redeliberate after it entered a verdict acquitting the defendant of first degree murder but finding true murder special circumstances. The court in *Bigelow* explained the following basic principles: "First, once the jury submits a verdict of acquittal to the trial court, the court may not order reconsideration of that verdict but rather must order that judgment be entered on the verdict. [Citations.] Second, a trial court may not coerce a jury by rejecting its verdict and requesting it to continue deliberating. [Citations.]" (*Id.* at p. 1134.)

In *Bigelow*, the finding of not guilty of murder was inconsistent with the special circumstances findings. The court noted that, "if the initial verdict unequivocally manifested the intent to acquit, it was a valid verdict regardless of its formal defects or legal inconsistency." (*Bigelow, supra,* 208 Cal.App.3d at p. 1136.) The *Bigelow* court concluded, however, that the verdict was ambiguous because of the inconsistency of acquittal of murder and findings that special circumstances existed. (*Ibid.*) Therefore, the trial court had the following limited options: "The court could have either 1) granted the motion to record the verdict of acquittal, 2) polled the jury to determine if there were

12 votes for acquittal, or 3) informed the jury that the acquittal was not consistent with findings of special circumstances and asked it to clarify its verdict to show its true intent." (*Ibid.*) The *Bigelow* court held the trial court erred because the trial court did not proceed under any of these options. Instead, the trial court merely sent the jury back to deliberate. (*Bigelow, supra,* 208 Cal.App.3d at p. 1136.)

In *Bigelow*, the court explained that it was distinguishable from cases in which the trial court properly resubmitted inconsistent verdicts to the jury. Cases upholding resubmission "presented patent and necessary inconsistency, namely, findings of guilty and not guilty on the same charge." (*Bigelow, supra,* 208 Cal.App.3d at pp. 1137-1138.) In addition, "the jury error was immediately corrected, with no lengthy further deliberations." (*Id.* at p. 1138.)

We recognize the general principle that "an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911; see also *People v. Avila* (2006) 38 Cal.4th 491, 600 and *People v. Espiritu* (2011) 199 Cal.App.4th 718, 727.) But, as explained in *Bigelow*, when the verdict or enhancement has not yet been entered or recorded and a verdict of acquittal is ambiguous due to blatant inconsistency, the trial court can properly explain the inconsistency to the jurors, obtain clarification from the jury, and allow reconsideration. (*Bigelow, supra,* 208 Cal.App.3d at p. 1136; *People v. Caird* (1998) 63 Cal.App.4th 578, 586-590; *People v. Keating* (1981) 118 Cal.App.3d 172, 181-182.)

34

Here, the jury's rejection of the multiple victim allegations was patently inconsistent with the jury's finding defendant guilty of committing sexual offenses against multiple victims. Because of this clear inconsistency, the trial court appropriately exercised its options of polling the jury, informed the jury of the inconsistency, and assessed the jury's true intent, in accordance with *Bigelow*. After the jurors stated that their not true findings on the multiple victim allegations were not their true and correct findings and requested to reconsider their findings, the trial court appropriately allowed the jury to redeliberate. (*Bigelow, supra,* 208 Cal.App.3d at p. 1136.) In raising the inconsistency, "'the trial court has broad latitude in fair commentary, so long as it does not effectively control the verdict.'" (*People v. Espiritu* (2011) 199 Cal.App.4th 718, 728, quoting *People v. Rodriguez* (1986) 42 Cal.3d 730, 768.) Here, the trial court did not effectively control the verdict or jury findings on the multiple victim allegations.

Defendant's reliance on *Guerra, supra,* 176 Cal.App.4th 933, for the proposition that the trial court erred in refusing to accept the jury's not true findings on the multiple victim allegations, is misplaced. In *Guerra*, the jury found the defendant guilty of committing sexual offenses against his daughter and another girl. The jury also initially returned not true findings on the multiple victim allegations. (*Id.* at pp. 935-936.) The trial court told the jury the verdicts appeared to be inconsistent with the allegation findings. The jury foreman conceded that she and the jury must have misunderstood the instruction on the multiple victim allegations. The court reread the instruction for the multiple victim allegation and further instructed the jury: "'The instructions and the verdict form would indicate to the court that if in the case being tried before you there is

35

more than one victim that the defendant has been convicted of sexually assaulting as charged, that the answer to those allegation questions should be true.'" (*Guerra, supra,* 176 Cal.App.4th at p. 939.)

The *Guerra* court held that the trial court improperly informed the jury that they should find the multiple victim allegation true, and sent the jury back to deliberate, without first discerning the jury's true intent. (*Guerra, supra,* 176 Cal.App.4th at pp. 943-944.) The instant case is distinguishable from *Guerra* because the trial court explained the inconsistency to the jury and polled the jury to determine each juror's intent. Upon the jurors stating that their allegation findings were not true and correct, the court asked the jury if it wanted to reconsider its findings, and the jury said it wished to do so. In this case, the trial court did not mandate that the jury redeliberate. The trial court also did not direct the jury to change its findings on the multiple victim allegations to "true." The trial court told the jury, that upon redeliberation, it could still find the allegations "not true." The trial court allowed the jury to redeliberate and reach its own result, without directing a particular outcome. Because the trial court properly addressed the clear inconsistency between the verdicts and multiple victim allegations in accordance with *Bigelow,* the trial court did not exceed its statutory or constitutional authority by allowing the jury to reconsider its findings on the multiple victim allegations.

## VII

## DISPOSITION

The conviction for violating section 269, subdivision (a)(4), (count 3) is reduced to a conviction for the lesser included offense of violating section 288a, subdivision (c)(1), due to the insufficiency of evidence of force, violence, duress, menace or fear of immediate, unlawful bodily injury.  As modified, the judgment of conviction is affirmed as modified and remanded for resentencing on count 3.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


KING
J.