Filed 7/18/23  P. v. Andres CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>BERNARDO JOSEFIN ANDRES,<br><br>   Defendant and Appellant. | 2d Crim. No. B321459<br>(Super. Ct. No. 19CR03336)<br>(Santa Barbara County) |

Bernardo Josefin Andres appeals from the judgment entered after a jury had convicted him of committing multiple sex offenses against his stepdaughter, Jane Doe.  He was convicted of sexual intercourse with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a));[1] sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b)); two counts of forcible lewd act upon a child under the age of 14 years (§ 288, subd. (b)(1)); three

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

counts of lewd act upon a child 14 or 15 years of age (§ 288, subd. (c)(1)); and dissuading a person from reporting a crime (§ 136.1, subd. (b)(1)).

Appellant waived his right to a jury trial on aggravating factors alleged in the information. The trial court found true three aggravating factors: the victim was particularly vulnerable, appellant took advantage of a position of trust or confidence, and he threatened witnesses or dissuaded them from testifying. The trial court sentenced appellant to an aggregate determinate term of 26 years, four months, followed by a consecutive aggregate indeterminate term of 40 years to life.

Appellant contends: (1) he did not knowingly and intelligently waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436); (2) if he waived his *Miranda* rights, he subsequently invoked his right to remain silent; (3) the trial court erred in permitting the People's expert to testify about Child Sexual Abuse Accommodation Syndrome; and (4) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. We affirm but direct the trial court to correct clerical errors in the Indeterminate Abstract of Judgment.

*Appellant Knowingly and*

*Intelligently Waived His Miranda Rights*[2]

"'*Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary

---

[2] We omit a summary of the evidence presented at trial. The facts underlying appellant's convictions are immaterial to the issues on appeal.

2

in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. . . .'" (*People v. Combs* (2004) 34 Cal.4th 821, 845.)

"'On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary [citation], whether his *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his [rights] [citation].  We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and '"accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence."'" [Citation.]  When [as here] 'an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.'" (*People v. Suarez* (2020) 10 Cal.5th 116, 158.)

Appellant contends he did not knowingly and intelligently waive his *Miranda* rights because "the *Miranda* advisals were given to [him] in Spanish, which is not his native Chinanteco language."  Before appellant was given the *Miranda* warnings, he said he was from the Mexican state of Oaxaca.  Pursuant to Evidence Code sections 459 and 452, subdivision (h), we take judicial notice that "[t]he Chinantec . . . languages . . . are spoken

3

by the indigenous Chinantec people . . . in Oaxaca . . . ." <https://en.wikipedia.org/wiki/Chinantecan_languages> [as of May 12, 2023] archived at <https://perma.cc/7DKF-PLA5>.

In the trial court defense counsel argued: "[A]ny reasonable officer should have realized [appellant] was not a native Spanish speaker. That realization should have triggered an inquiry as to whether or not [his] native tongue was something other than Spanish. . . . Although [appellant] can converse in Spanish, Spanish is his second language and his proficiency in Spanish is not equivalent to his ability to speak and comprehend Chinanteco."

At the hearing on appellant's motion to exclude his statements, the court said, "As to the issue of the underlying language of Chinantec versus Spanish, the overall exchange [during the police interrogation] in the Court's review of the evidence makes it apparent that [appellant] understood and was understandingly responsive to the questions of the detective."

Exercising our independent review, we conclude the evidence shows that appellant knowingly and intelligently waived his *Miranda* rights. After reading appellant his rights in Spanish, Detective Rocio Cazares asked if he understood them. Appellant replied, "Yes," and he agreed to speak with her. He did not say that his native language was Chinanteco or that he had difficulty understanding Spanish. Nor did he request an interpreter. Appellant's responses during the interrogation demonstrate that he spoke Spanish fluently. Detective Cazares testified that the conversation between her and appellant "flowed" like a normal conversation and that he appeared to understand what she was "saying to him."

4

Based on the following colloquy between appellant and Cazares, appellant maintains Cazares "had a duty to clarify that [he] understood he had the right to remain silent and [understood] the consequences of waiving that right" before she took the *Miranda* waiver:

> "CAZARES: Do you understand all of the rights that I have just explained to you?
> [APPELLANT]: Yes.
> CAZARES: Yes?
> [APPELLANT]: Uh-huh.
> CAZARES: Okay. Taking into account those rights, do you wish to speak with me now?
> [APPELLANT]: *No. Like about what you ask me or . . .?* [Italics added.]
> CAZARES: Yes.
> [APPELLANT]: Yes, I agree.
> CAZARES: Yes? It's ok?
> [APPELLANT]: Mhm"

Cazares did not have a duty to further explain appellant's *Miranda* rights. Nothing in the above colloquy indicates that appellant did not understand his right to remain silent. We reject appellant's assertion that "[t]he contradictory nature of appellant's statements and the fact that Spanish is not his native language indicate that he did not understand his right to remain silent."

We also reject appellant's claim that his initial "No" response was an invocation of his right to remain silent. The "No" was immediately followed by an inquiry seeking clarification of Cazares's question, "[D]o you wish to speak with me now?" Cazares merely answered "Yes" to appellant's inquiry. Appellant then made clear that he agreed to speak with her.

5

*After Waiving His Miranda Rights, Appellant*
*Did Not Invoke His Right to Remain Silent*

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence . . . . [Citation.]  It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights.  [Citation.]  Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* . . . to cease questioning altogether.  [Citation.] . . . [A] rule requiring a clear invocation of rights from someone who has already received and waived them 'avoid[s] difficulties of proof' [citation], and promotes 'effective law enforcement.'"  (*People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*).)

"[O]nce a . . . suspect has made a valid waiver of the *Miranda* rights, any subsequent assertion of the right to counsel or right to silence during questioning must be articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of such rights.  [Citations.]"  (*People v. Nelson* (2012) 53 Cal.4th 367, 379-380.)  "[B]ecause a postwaiver invocation determination contemplates reference to a reasonable officer's understanding of a suspect's statements in light of known or objectively apparent circumstances, the suspect's subjective desire for counsel [or to remain silent] is not relevant."  (*Id*. at p. 377.)

Appellant claims that, after waiving his *Miranda* rights, he twice invoked his right to remain silent.

6

<u>First Invocation</u>

The first invocation allegedly occurred during the following conversation:

> "CAZARES: Okay.  So, tell me about the *allegations of why you are here*.  [Italics added.]
> [APPELLANT]: But the *allegations*, how?  That, uh. *I prefer to remain silent* or you must already know because I didn't know what happened.  You must already know the, what the reason is.  And I think that I am willing, in your hands, I complied with all, with the law that I am being accused, and what else can I say?  [Italics added.]
> CAZARES: Okay. Tell me when you, the first time you touched [Jane Doe]."

The trial court concluded that appellant's statements were not "a full invocation of his right to remain silent."  The court interpreted the statements as indicating only that appellant did not want to speak about the "allegations of why [he was] here."  His statements "moved [Detective Cazares] to a different subject."

A reasonable police officer in Detective Cazares's situation could have similarly interpreted appellant's statements.  "A suspect may invoke his right to remain silent selectively." (*People v. Flores* (2020) 9 Cal.5th 371, 425 (*Flores*).)  "A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.'"  (*People v. Silva* (1988) 45 Cal.3d 604, 629-630.) "Through the exercise of [a suspect's] option to terminate questioning he can control . . . the subjects discussed . . . ." (*Michigan v. Mosley* (1975) 423 U.S. 96, 103-104.)  Appellant indicated that he did not want to discuss the "allegations" against

7

him that had led to his arrest.  He did not unambiguously express a desire to cut off all questioning.

Second Invocation

The second invocation of appellant's right to remain silent allegedly occurred during the following conversation about DNA evidence:

> "CAZARES: Okay. Do you know what is DNA?
> [APPELLANT]: Yes.
> CAZARES: . . . [I]s there any reason why your DNA could be in her [Jane Doe's] underwear?  [This was a ruse; there was no DNA evidence.]  Explain it to me.
> [APPELLANT]: Yes, there is a reason.
> CAZARES: Okay, explain it to me.
> [APPELLANT]: Did you find that in her underwear?
> CAZARES: I'm asking you.
> [APPELLANT]: Did that happen now, officer?
> CAZARES: No?
> [APPELLANT]: *I prefer to remain silent.*  And, uh, well, yes, *I prefer to remain silent*, officer, I am already in your hands.  Yes, detective, I am already in your hands.  [Italics added.]
> CAZARES: What, what are you saying, I don't understand.
> [APPELLANT]: You, uh, well, what other evidence can you have if, if you already ran the DNA to the girl?
> CAZARES: So, I don't understand, do you want to talk to me, or you don't want to talk to me?
> [APPELLANT]: Detective, uh, what else can I say?
> CAZARES: I just want to know the truth, Bernardo.  Okay.
> [APPELLANT]: What else can I say?
> CAZARES: I feel that you have something to tell me, and that you want to tell me, I don't know if you want to, to feel better or because you have a burden, but I just want to know what happened with [Jane Doe].

8

[APPELLANT]: Okay, detective. It happened something else now. Uh, I think that's why . . . I am guilty, detective."

In the above conversation appellant voiced his preference to remain silent in response to Cazares's insistence that he explain how his DNA could have been found in his stepdaughter's underwear. A reasonable police officer could have inferred that appellant wished to remain silent only as to the requested explanation.

Moreover, "[a] reasonable officer in Detective [Cazares's] position [c]ould have concluded that [appellant's statement that he preferred to remain silent] expressed apparent frustration [about the alleged DNA evidence], but did not end the interview." (*Stitely, supra,* 35 Cal.4th at p. 535.) In *People v. Williams* (2010) 49 Cal.4th 405, 434, our Supreme Court concluded that "the statement . . . – 'I don't want to talk about it' – was an expression of defendant's frustration with [Detective] Salgado's failure to accept defendant's repeated insistence that he was not acquainted with the victim as proof that he had not encountered her on the night of the crime, rather than an unambiguous invocation of the right to remain silent." The court explained, "'A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning.'" (*Id.* at p. 433.)

The ambiguity of appellant's statements was heightened by his use of the word "prefer."[3] In *Delashmit v. State* (Miss. 2008) 991 So.2d 1215, 1221 (*Delashmit*), the court said, "Delashmit's statement of 'I prefer a lawyer' was only an ambiguous mention of possibly speaking with an attorney. . . . [W]e find that this statement was insufficient to invoke the right to counsel. Clearly, a reasonable police officer would not understand this statement alone to be an unequivocal assertion of the right to counsel."

Our Supreme Court cited *Delashmit* in *People v. Molano* (2019) 7 Cal.5th 620, 660: "see also *Delashmit*[, *supra,*] 991 So.2d [at pp.] 1219, 1221 [defendant's statement, "'I prefer a lawyer'" was ambiguous]." The *Molano* court held, "[A]ssuming, as defendant asserts, that he said he would 'feel more comfortable' if he spoke to a public defender first, the comment did not amount to a 'clear assertion' of the right to counsel under our high court's precedent." (*Molano,* at p. 659.) The *Molano* court apparently believed that the defendant's statement that he would "feel more comfortable" with a lawyer was similar to Delashmit's statement, "I prefer a lawyer."

"In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the

---

[3] After waiving his *Miranda* rights, appellant also used the word "prefer" in his first alleged invocation of his right to remain silent. (See p. 7, *ante*.)

defendant." (*Williams, supra,* 49 Cal.4th at p. 429.) This is one of those instances where Detective Cazares's follow-up questions were permissible to ascertain appellant's true intent. (See *Flores, supra,* 9 Cal.5th at p. 422 ["we conclude that defendant's '[n]o,' in context, was susceptible of more than one possible interpretation. [Lieutenant] Kusch therefore was not forbidden from asking his followup question to clarify defendant's intent"]; *Medina v. Singletary* (11th Cir. 1995) 59 F.3d 1095, 1105 ["Taking into consideration the events preceding Medina's response, Medina's 'No' was ambiguous and did not clearly indicate his desire to remain silent. . . . [¶] . . . "To prohibit a clarifying question under the circumstances . . . would 'transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity'"].) "[A]lthough the right to silence is the core right protected by *Miranda,* . . . 'we must consider the other side of the *Miranda* equation: the need for effective law enforcement.'" (*People v. Martinez* (2010) 47 Cal.4th 911, 949.)

### *The Trial Court Did Not Err in Admitting Evidence of Child Sexual Abuse Accommodation Syndrome*

The trial court permitted the People's expert to testify about Child Sexual Abuse Accommodation Syndrome (CSAAS). "'Expert testimony on "the common reactions of child molestation victims," known as CSAAS theory evidence, "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." [Citation.] "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused

11

children's seemingly self-impeaching behavior.'" . . .'" (*People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64.)

Appellant contends: "CSAAS is not a diagnosable syndrome, it was not created as a forensic tool, and it is not adequately reliable, detailed, or scientific." (Bold omitted.) "CSAAS is subject to the *Kelly-Frye* [test] because it purports to present a scientific analytic technique," but it has not been shown to satisfy the test's requirements. "'[T]he *Kelly/Frye* test constitutes a judicially created rule relating to the admissibility of certain types of evidence . . . .' [Citation.] '[U]nder the *Kelly–Frye* rule the proponent of evidence derived from a new scientific methodology must satisfy *three* prongs, by showing, first, that the reliability of the new technique has gained general acceptance in the relevant scientific community, second, that the expert testifying to that effect is qualified to do so, and, third, that '"correct scientific procedures were used in the particular case."'"" (*Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1309.)

Appellant's contentions are similar to the contentions we rejected in *People v. Munch* (2020) 52 Cal.App.5th 464. We noted, "The CSAAS evidence Munch challenges has been ruled to be properly admitted by the courts of this state for decades." (*Id.* at p. 472.) Pursuant to our reasoning in *Munch* (*id.* at pp. 468-473), we reject appellant's contentions. (See also *People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*) ["expert CSAAS testimony is not ""scientific"' evidence' subject to the *Kelly* rule"].)

Appellant argues that the trial court abused its discretion in admitting the CSAAS evidence because "it was more prejudicial than probative." (Bold omitted.) Therefore, the evidence should have been excluded under Evidence Code section

352 (section 352), which provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"Evidence is not 'prejudicial' merely because it is harmful to a criminal defendant's case. [Citation.] Indeed, essentially all relevant evidence introduced by the prosecution is likely to be harmful to a defendant's case. Evidence only creates 'undue prejudice' if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case. [Citation.] 'The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.'" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

"We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

In his motion to exclude CSAAS evidence, appellant's section 352 argument was as follows: "CSAAS was developed as a treatment aid for confirmed child abuse victims, not a forensic tool. Its presentation in the courtroom has the strong chance of misleading the jury as to its purpose. CSAAS testimony is explicitly barred from being introduced to show that a child has displayed common signs of victims, and therefore is likely to have

been sexually assaulted. However, introducing this testimony is extremely likely to entice the jury into drawing this exact conclusion. Therefore, the limited probative value CSAAS testimony has in dispelling myths is far outweighed by its potential to unfairly prejudice the jury against the defendant."

In their opposition to the motion, the People argued: "The introduction of CSAAS evidence . . . is relevant because the instant case involves allegations by Jane Doe of sexual abuse incidents starting as early as when [she] was seven years old. Law enforcement did not discover the abuse until nearly eight years later. Jane Doe staying within the home and having not reported the incident by itself presents 'paradoxical' behavior, as identified by [*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745]. The presentation of CSAAS evidence will help jurors resolve this paradox and [they] will be better equipped to understand the full context of Jane Doe's disclosure and assess her credibility. . . . Once educated on CSAAS, jurors will be freed of mistaken beliefs surrounding child sexual abuse and delays in reporting." The People maintained that a jury instruction – CALCRIM No. 1193 – would "properly admonish[] the jury as to the limited purpose of CSAAS evidence."

The trial court accepted the People's argument. It concluded "that the probative value of the expert testimony [on CSAAS] outweighs any prejudicial effect." The court explained, "The relevancy is to show the aspects of Jane Doe's behavior were not inconsistent with abuse having taken place . . . ." The court said it would give an appropriate "limiting instruction" on CSAAS evidence.

"The [trial] court made a reasoned judgment that the probative value of the proffered CSAAS evidence was

14

substantially outweighed by any prejudicial effect.  (See § 352.)
Prior to its evidentiary ruling, the prosecutor informed the court
about the anticipated evidence . . . .  The court plainly did not
approach its ruling in an arbitrary or capricious manner.  Thus,
we find no abuse of discretion." (*Lapenias*, *supra*, 67 Cal.App.5th
at p. 174.)

Appellant claims the admission of the CSAAS evidence
violated his Sixth and Fourteenth Amendment rights to due
process.  "Generally, a court's compliance with the rules of
evidence does not violate a defendant's right to due process.
[Citation.]  Further, reviewing courts have routinely held the
admission of CSAAS evidence does not violate due process.
[Citations.]" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

*The Trial Court Did Not Err in Instructing*
*The Jury Pursuant to CALCRIM No. 1193*

Pursuant to CALCRIM No. 1193, the trial court instructed
the jury: "You have heard testimony from Dr. Anthony Urquiza
regarding Child Sexual Abuse Accommodation Syndrome.  Dr.
Anthony Urquiza's testimony . . . is not evidence that the
defendant committed any of the crimes charged against him or
any conduct or crimes with which he was not charged.  You may
consider this evidence only in deciding whether or not Jane Doe's
conduct was not inconsistent with the conduct of someone who
has been molested[,] and in evaluating the believability of [her]
testimony."

Appellant maintains the instruction violated his Sixth and
Fourteenth Amendment rights to due process.  He argues that
CALCRIM No. 1193 "permits jurors to use CSAAS evidence in
the very way that is prohibited – to determine if the sexual abuse
actually happened."  In addition, appellant asserts that the

15

instruction "is fundamentally argumentative because it expressly permits jurors to use CSAAS evidence to determine if the complainant's behavior is consistent with that of a sexual abuse victim, but ignores the defensive inference that the same behavior might suggest falsity."

Appellant notes that, in *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504, we "rejected a challenge to CALCRIM No. 1193, similar to the one made here." Appellant has not persuaded us to reexamine our reasoning in *Gonzales*. In *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176, the court stated: "We agree with *People v. Gonzales* . . . . We similarly hold the official jury instruction accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence. Thus, we find the trial court did not commit error by instructing the jury with CALCRIM No. 1193."

*Appellant's Sentence Does Not Constitute Cruel and Unusual Punishment in Violation of the Eighth Amendment*

Appellant was sentenced to an aggregate determinate term of 26 years, four months, followed by a consecutive aggregate indeterminate term of 40 years to life. Appellant notes that, at the time of sentencing, he was 39 years old. Appellant argues, "While the conduct as found true by the jury is morally reprehensible, [he] does not deserve a sentence which is the functional equivalent of life without the possibility of parole." Appellant claims his sentence "is cruel and unusual and violates the Eighth Amendment." (Bold omitted.)

We disagree. In *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, the defendant was convicted of 25 counts of sexually abusing his stepdaughter over an extended period of time. He was sentenced to prison for 129 years. On appeal, he

16

contended the sentence "constitutes cruel and unusual punishment in violation of both federal and state Constitutions." (*Id*. at p. 528.) His "principal argument [was] based on the fact that a sentence of 129 years is equivalent to a sentence of life without possibility of parole." (*Id*. at p. 531.) The appellate court concluded that, in view of his multiple sex crimes, the 129-year sentence was not cruel or unusual punishment. (*Id*. at p. 532.) The same reasoning applies to appellant's sentence, especially in view of the aggravating factors found true by the trial court.

"[I]t is immaterial that [appellant] cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment . . . ." (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.)

"In *Harmelin v. Michigan* (1991) 501 U.S. 957 . . . , the United States Supreme Court concluded that a term of life without the possibility of parole for possessing more than 650 grams of cocaine did not constitute cruel and unusual punishment [within the meaning of the Eighth Amendment]. It follows that, in view of appellant's far more serious . . . crimes . . . [against his stepdaughter], his sentence [does not violate the Eighth Amendment]." (*People v. Leon* (2010) 181 Cal.App.4th 452, 469.)

*Clerical Errors in Indeterminate Abstract of Judgment*

Appellant acknowledges that the trial court imposed "*consecutive sentences*, amounting to 40 years-to-life and an additional determinate sentence of 26 years and 4 months."

17

(Italics added.)  The People refer to appellant's "combined sentence of 66 years four months to life."

There are two abstracts of judgment – one for the determinate sentence and the other for the indeterminate sentence.  The determinate abstract is correct.  It shows that appellant was sentenced to an aggregate determinate term of 26 years, four months.  The indeterminate abstract correctly shows that appellant was sentenced to 25 years to life on count 1 and 15 years to life on count 2.  It does not show that the court ordered the term on count 2 to run consecutively to the term on count 1.  Nor does it show that the court ordered the aggregate indeterminate term of 40 years to life to run consecutively to the aggregate determinate term of 26 years, four months.  "Where, as here, the trial court imposes an indeterminate life sentence and a determinate sentence, it has discretion to decide whether the sentences shall be served concurrently or consecutively."  (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1264; see also § 669 ["Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first"].)

Neither party has raised the clerical errors in the Indeterminate Abstract of Judgment.  In the disposition set forth below, we direct the trial court to correct the errors.

*Disposition*

The judgment is affirmed.  The trial court is directed to correct the clerical errors in the Indeterminate Abstract of Judgment as discussed in the above section entitled "*Clerical Errors in Indeterminate Abstract of Judgment*."  The corrected abstract of judgment shall show that the 15-year-to-life

indeterminate term on count 2 runs consecutively to the 25-year-to-life indeterminate term on count 1. It shall also show that the aggregate indeterminate term of 40 years to life runs consecutively to the aggregate determinate term of 26 years, four months. The trial court is further directed to transmit certified copies of the Determinate Abstract of Judgment and the corrected Indeterminate Abstract of Judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


CODY, J.

19

Patricia Kelly, Judge

Superior Court County of Santa Barbara

_____

Bases & Bases and Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.