[Crim. No. 44384. Second Dist., Div. Six. Apr. 3, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DALE W. BESTELMEYER, Defendant and Appellant.

## COUNSEL

Keith C. Monroe for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Susan Lee Frierson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEVENS, J.*—**Defendant was charged in a 33-count information with a variety of sex crimes. He was convicted of 25 of the offenses which included violations of Penal Code sections 286, subdivision (c), 288a, subdivision (c), 288, subdivision (b), and 289. He was sentenced to a total of 129 years in prison. In this appeal defendant contends that the lengthy sentence constitutes cruel and inhuman punishment in violation of state and federal Constitutions. He also contends that his confession was involuntary and should not have been received in evidence. We find no error in the record and affirm the judgment.

### FACTS

At the time of trial the defendant's stepdaughter was 11 years old. The evidence showed that defendant had sexually abused the child repeatedly

---

*Assigned by the Chairperson of the Judicial Council.

and over a long period of time before his arrest on August 17, 1982. We need not detail the sordid activities engaged in by the defendant except to note that they involved oral copulation, sodomy, the insertion of foreign objects in the child's anus and other bizarre sexual conduct.

Following his arrest the defendant was interviewed by Sergeant Edstrom and Detective Cullen of the Simi Valley Police Department. After advising the defendant of his constitutional rights the following discussion took place:

"[Cullen]: . . . . Do you understand all these rights as I've explained them to you, Dale?

"[Def]: Yes.

"[Cullen]: Do you have any questions about your Rights?

"[Def]: Hum, no. Well, some.

"[Cullen]: Having these Rights in mind and knowing that what you say will be used against you in court, do you wish to give up those rights and talk to me about the charges?

"[Def]: I don't know what to do.

"[Cullen]: Ok, I want you to think about it for a few minutes and you can ask me some questions about your rights if you don't understand them, and let's talk about it.

"[Def]: I, I.

"[Cullen]: This is your, an opportunity for you not to talk or to talk to us, either with representation.

"[Def]: Yea, yea I realize that.

"[Cullen]: or without. Just take it easy, why don't you just kick back a minute.

"[Edstrom]: You don't have to go into it blind either, Dale. You can ask us what we mean when we read these things to you too. Any part of it you don't understand, we would be more than happy to explain it to you, we want you to understand before, before we proceed.

"[Def]: I don't know what to ask.

"[Cullen]: What are your fears, what are you thinking.

"[Def]: I just thinkin', maybe I shouldn't say anything without a lawyer and then I thinkin' ahh.

"[Cullen]: You know what even if you, if you waive your rights, which means if you decide to talk to us, you can stop talking at any time? You can refuse to answer, or you can not talk at all.

"[Edstrom]: You can, you can re-in, you can re-invoke your rights once you waive them, if that's what you're worried about. If, if we have questions what you don't want to answer, you say I don't want to answer that question or I don't want to, I just don't want to continue, or, you know. It's totally on your side.

"[Def]: Yea.

"[Edstrom]: I mean we want you to note that. But once, once you say that you wish to remain silent then we're not allowed to talk to you anymore, so we can't get any part of your statement that would even be to your defense. (Long pause.)

"[Def]: Yea, I'm just

"[Cullen]: It's hard (Pause.)

"[Cullen]: Would you like some clearification [*sic*]? Would you like me to read them again?

"[Def]: No, no. no that's

"[Cullen]: Do you understand?

"[Def]: Yea, I understand them okay, it's just

"[Cullen]: You're just not sure you want to talk or not?

"[Def]: Yea, I just don't know what to do. I just

"[Cullen]: You understand what you're being charged with?

"[Def]: Can I ask question about that or does that have to come later or

"[Cullen]: No, no you, you can ask me any questions you want. I may not answer them but I'm more, you know, I want to, we want to cooperate with you as much as we can and of course we

"[Def]: Yea, and I want to cooperate with you

"[Cullen]: want you to cooperate with us.

"[Def]: Yea, I do, I just

"[Cullen]: But sure, you can ask questions.

"[Def]: Ah, who brought the charges?

"[Edstrom]: We can't, we didn't know who'll sign the complaint in court. (Pause.)

"[Cullen]: Want to know about the kids?

"[Def]: Yea, they're okay?

"[Edstrom]: The kids are fine.

"[Cullen]: The kids are okay. They're not angry, they love you.

"[Def]: I love them.

"[Cullen]: I know you do. They're okay.

"[Def]: ——

"[Cullen]: Dawn's okay.

"[Def]: She's okay, okay. Yea, I'll, I'll talk.

"[Cullen]: Ok, you understand that you don't have to?

"[Def]: Yea, I understand I just."

After the above discussion the defendant proceeded to make incriminating statements and to admit certain of the charges that were made against him.

### I

A timely motion was made by defense counsel to exclude the confession from consideration at the trial. Following a hearing the trial court found

that the defendant's mention of an attorney was not an indication that he wished to invoke his right to counsel, but was only an indication that he was considering it. The defendant contends that this finding was erroneous. He argues that the reference to a lawyer should be considered an invocation of the constitutional right to counsel. If the defendant is correct then any questioning after the defendant mentioned the word "Lawyer" was improper.

The above conversation was tape recorded. A transcript of the taped conversation was prepared by the investigating police officers and that transcript was received in evidence at the trial. The recording itself was also received in evidence and was listened to by the trial judge. As so often happens, the tape recording was not of the best quality and there was disagreement as to what was actually said. The court listened to the tape, read the transcript and considered argument of counsel before resolving the conflicts as to what was said. In doing so the court had the benefit of the written transcript and the tape recording itself. This allowed the trial judge to hear the words spoken with all the inflections, intonations and pauses that add meaning to the bare words.

■ It is the function of the trial judge to determine whether the defendant did in fact knowingly and voluntarily waive his right to remain silent and his right to have the assistance of counsel. This determination is to be made based on the totality of the circumstances surrounding the interrogation. (*Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560]; *In re Brian W.* (1981) 125 Cal.App.3d 590 [178 Cal.Rptr. 159].) The assertion of privilege or its waiver constitutes a question of fact which can only be decided after taking into account the special circumstances of each case. (*People* v. *Turnage* (1975) 45 Cal.App.3d 201 [119 Cal.Rptr. 237].) Where the evidence is in conflict, the trial court's findings in this regard will be accepted by the appellate court unless it is palpably erroneous or entirely unworthy of belief. (*People* v. *Brockman* (1969) 2 Cal.App.3d 1002 [83 Cal.Rptr. 700]; *People* v. *Hutchings* (1973) 31 Cal.App.3d 16 [106 Cal.Rptr. 905]; *People* v. *Watson* (1977) 75 Cal.App.3d 384 [142 Cal.Rptr. 134].)

■ It is clear from the record before us that the defendant was advised of his rights and that he understood them. It is also clear that he spent sometime pondering whether or not he should give up his right to remain silent and his right to consult with an attorney before he spoke to the officers. The officers were courteous, polite and low-key. The record is devoid of evidence that there was pressure or coercion brought to bear. Nevertheless defendant urges us to find that defendant invoked his right to consult

counsel when he said "I just thinkin', maybe I shouldn't say anything without a lawyer and then I thinkin' . . . ."

We have reviewed the cases relied on by the defendant in support of his position. This is not like the situation found in *People* v. *Enriquez* (1977) 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73], where the confession was given as a result of continued police pressure on defendant to waive his right to an attorney after he had clearly indicated that he wanted an attorney present. Nor is it like *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], where police persisted in questioning the defendant after he had invoked his right to remain silent; nor is it like *People* v. *Randall* (1970) 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114], where police questioned the defendant after he had requested an attorney and after he had spoken to his attorney on the telephone.

Defendant also cites the recent United States Supreme Court case of *Smith* v. *Illinois* (1984) 469 U.S. — [83 L.Ed.2d 488, 105 S.Ct. 490]. In that case investigating police officers gave the standard *Miranda* warning to an 18-year-old suspect. When asked if he wanted a lawyer he responded affirmatively. The court found his response to be clear and unambiguous. The officer ignored defendants request for counsel and continued with the balance of the *Miranda* warnings. Defendant was then asked if he wanted to talk without a lawyer being present. His response to these later questions was equivocal. He eventually agreed to talk and made incriminating statements. The trial court and the Supreme Court of the State of Illinois held that the totality of the circumstances showed that the defendant waived his right to counsel. The United States Supreme Court disagreed. The Supreme Court did not disapprove of the "totality of the circumstances test" which was applied by the Illinois courts. The court found that defendant's first request for counsel was clear and unambiguous. Therefore, all further questioning should have been terminated at that point. The trial court should not have considered the subsequent equivocal responses to establish ambiguity.

Contrary to the defendant in *Smith,* the defendant in the case at bench did not clearly and unambiguously request an attorney. His reference to a lawyer was patently ambiguous.

The case that comes closest to supporting the defendant's position is *People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390]. In that case defendant and a companion had waived their *Miranda* rights and had spoken to the police at some length. Pursuant to an agreement they returned to the police station the next day and talked again for an hour or an hour and a half. Finally one of the suspects stated either

"I guess we need a lawyer" or "Do you think we need an attorney." They also asked the police to recommend an attorney. The officers stated that they could not recommend an attorney but referred them to the telephone directory which listed local attorneys. The officers then told the suspects that they were guilty and urged them to talk the matter over. The two suspects were then left alone with a telephone directory for about five minutes. The officers returned and asked them if they had made any decisions. At that point the defendant told the officers that he wanted to talk to them and proceeded to confess.

When we compare the facts of the *Zolnay* case with the facts of the case at bench the differences are immediately obvious. In *Zolnay* the defendant's statement that he needed a lawyer came after he had previously waived his right to counsel and after some extended questioning. The totality of the circumstances in that case made it clear that defendant was in fact invoking his constitutional right. Nevertheless the interrogating officers continued to pressure the defendant for an admission of guilt, not unlike the circumstances found in the case of *People* v. *Enriquez, supra,* 19 Cal.3d 221.

The record before us does not support a finding that any of the tactics condemned in the above cited cases were employed here. We find that there is substantial evidence to support the trial judge's finding that the defendant did not intend to invoke his constitutional right to have an attorney present before he talked to the police officers and that he did in fact knowingly waive his right to counsel and voluntarily made the subsequent statements to the investigation officers. (*People* v. *Turnage, supra,* 45 Cal.App.3d 201.)

The defendant has also complained that the officers engaged in some sort of psychological softening up of the defendant when he was asked if he wanted to know about the kids. We certainly recognize that experienced police interrogators can develop subtle psychological techniques in their questioning which would produce responses that are not truly voluntary. This record does not indicate that the few brief comments of Detective Cullen fall into that category. (See *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Posten* (1980) 108 Cal.App.3d 633 [166 Cal.Rptr. 661].)

## II

The defendant contends that the sentence of 129 years constitutes cruel and unusual punishment in violation of both federal and state Constitutions.

He argues that Penal Code section 667.6, subdivision (d), although constitutional on its face, is unconstitutional as applied in this case.

█ A defendant has a considerable burden to overcome when he challenges a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California and the court should not lightly encroach on matters which are uniquely in the domain of the Legislature. We must always be aware that it is the function of the legislative branch to define crimes and prescribe punishments. (*People* v. *Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001]; *In re Foss* (1974) 10 Cal.3d 910 [112 Cal.Rptr. 649, 519 P.2d 1073].) The legislative power is limited only by the constitution. It is the duty of the courts to examine legislative acts in light of the Constitution to make sure that a particular statute does not impinge on fundamental rights as applied in individual cases. █ We will, therefore, perform our constitutional duty and examine section 667.6, subdivision (d) and determine whether that section as applied in this case violated the defendant's rights under article I, section 17 of the California Constitution. (*In re Foss, supra,* 10 Cal.3d 910.)

An analysis of the question of cruel or unusual punishment must start with the case of *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]. In that carefully written, analytical opinion Justice Mosk concluded that a particular punishment may violate article I, section 17 (formerly art. I, § 6) of the California Constitution if it is so disproportionate to the crime for which it was inflicted that it "shocks the conscience and offends fundamental notions of human dignity." The opinion goes on to say that this broad general rule can be applied to the facts of a given case by employing three "techniques." These techniques are as follows:

(1) The nature of the offense and/or the offender with particular regard to the degree of danger both present to society;

(2) Comparison of the challenged penalty with punishment prescribed in the same jurisdiction for different offenses which must be deemed more serious;

(3) Comparison of the challenged penalty to punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision.

We will apply the three techniques in the *Lynch* case to the facts of the case presently before us. The first technique requires us to consider the nature of the offense, the nature of the offender and the degree of danger presented to society. Defendant acknowledges that the crimes are of a most

serious nature and he concedes that they present a significant danger to society. He argues, however, that even though the punishment may fit the crime, it does not, in this case, fit the criminal. (*People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].) He points out that the defendant has no prior criminal record, that he was suffering from mental impairment at the time the crimes were committed, and that there is no evidence that he has ever victimized anyone other than his stepdaughter. We agree that these are factors that should be considered along with all of the other factors developed by application of this first technique. However, when we weigh these factors which relate to the defendant against the very serious nature of these offenses and the very real danger to the community, we cannot conclude that the sentence is so disproportionate to the crimes for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.

The second technique requires us to compare the punishment imposed in the present case with the punishment prescribed for more serious offenses in California. Each of the crimes of which the defendant was convicted are punishable by sentences of three, six or eight years, or in the case of Penal Code section 288, subdivision (b), three, five or seven years. The defendant was sentenced to the midterm for 23 of the 25 counts. He was sentenced to the upper-term of seven years in 2 of the counts. All counts were ordered to be served consecutively pursuant to section 667.6, subdivision (d) except for counts 3, 6 and 7 where the midterm sentences were ordered to be served concurrently. The defendant does not appear to argue that the prescribed terms of three, six and eight years or three, five and seven years are unconstitutional when compared to sentences for more serious offenses. He argues that the constitutional defect lies in the fact that consecutive sentences are mandatory for these offenses while multiple convictions for crimes such as mayhem, kidnaping and murder can be sentenced concurrently. This identical argument had been made and rejected on several occasions since the Legislature enacted section 667.6, subdivision (d) in 1979. (*People* v. *Preciado* (1981) 116 Cal.App.3d 409 [172 Cal.Rptr. 107]; *People* v. *Belasco* (1981) 125 Cal.App.3d 974 [178 Cal.Rptr. 461]; *People* v. *Karsai* (1982) 131 Cal.App.3d 224 [182 Cal.Rptr. 406]; *People* v. *Wilson* (1982) 135 Cal.App.3d 343 [182 Cal.Rptr. 406]; *People* v. *Reynolds* (1984) 154 Cal.App.3d 796 [201 Cal.Rptr. 826].) ▪ Whether a particular punishment is disproportionate to the offense is a question of degree. The choice of fitting and proper penalty is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. (*In re Lynch, supra,* 8 Cal.3d 410.) Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not

transform a reasonable punishment into one that is cruel or unusual. (*People v. Preciado, supra,* 116 Cal.App.3d 409.) When they enacted Penal Code section 667.6, subdivision (d) the Legislature chose to treat violent sex offense and violent sex offenders differently than other types of offenses and offenders. ■■■ In view of the outrageous nature of this type of offense and in view of the danger that these offenses pose to society we cannot say that the imposition of consecutive sentences for multiple sex offenses shocks the conscience and offends fundamental notions of human dignity. (*People v. Reynolds, supra,* 154 Cal.App.3d 796.)

The third technique requires us to compare punishment imposed in this case with the punishment prescribed for the same offenses in other jurisdictions. Defendant has not provided us with any information from which we can conclude that other jurisdictions would have treated defendant more leniently than California for these multiple crimes of sexual abuse. He has provided us with a table showing the penalties for forcible rape in other jurisdictions. This defendant has not been charged with nor convicted of forcible rape. Such a comparison is of little benefit.

It would appear that the defendant's principal argument is based on the fact that a sentence of 129 years is equivalent to a sentence of life without possibility of parole. He acknowledges that appellate courts have held that lengthy sentences for multiple sex crimes do not constitute cruel or unusual punishment. He argues, however, that the longest sentence that has been considered by the appellate courts is 33 years. (*People* v. *Preciado, supra,* 116 Cal.App.3d 409.) He says that 129 years is tantamount to a sentence of life without possibility of parole since the defendant would not become eligible for parole until he has served at least one half of that sentence. He suggests that a sentence of 129 years is, therefore, unconstitutional per se. The case of *In re Rodriguez* (1975) 14 Cal.3d 639 [122 Cal.Rptr. 552, 557 P.2d 384], is instructive. In that case the defendant had been convicted of child molesting in violation of section 288 of the Penal Code. At that time the Indeterminate Sentence Law was in effect and defendant was subject to a maximum term of life imprisonment. The Supreme Court found that section 288 was not unconstitutional on its face and that a life sentence was not in and of itself cruel and unusual punishment.[1]

We must conclude that the Legislature was well within its constitutional prerogatives when it mandated full-term consecutive sentences for the type

---

[1]Although the court found that Penal Code section 288 was not unconstitutional on its face, they did find that it was unconstitutional as it was applied to Mr. Rodriguez in that case. Relying primarily on the first of the *Lynch* techniques the court held that a sentence of 22 years was grossly disproportionate when viewed in light of the offense and in light of the particular characteristics of the defendant.

of sex crimes we see in this case. Consecutive prison terms totaling 129 years imposed as punishment for the commission of 25 separate serious offenses is not cruel or unusual punishment.

The judgment of conviction is affirmed.

Stone, P. J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 27, 1985.