Filed 2/14/25  P. v. Wandrey CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>NATHAN CHRISTIAN WANDREY,<br><br>　　　Defendant and Appellant. | A169657<br><br><br>(Sonoma County Super. Ct.<br>　No. SCR-720916-1) |

Nathan Christian Wandrey was convicted of numerous counts of sex offenses committed over a three-year period against the daughter of his then-girlfriend and was ultimately sentenced to 84 consecutive aggravated prison terms totaling 588 years.  Wandrey argues his sentence violates the state and federal prohibitions against cruel and unusual punishment.  Wandrey further contends that clerical errors in the abstract of judgment must be corrected.  We agree that the abstract of judgment must be corrected to reflect the effective date of judgment, but we disagree that Wandrey's sentence constitutes cruel and unusual punishment and therefore affirm the ordered sentence in all other respects.

**BACKGROUND**

In November 2020, a jury convicted Nathan Christian Wandrey of 158 felony charges:  84 counts of assault with the intent to commit a sexual

offense against a child in violation of Penal Code[1] section 220, subdivision (a)(2), and 74 counts of the commission of a lewd act upon a child under age 14 in violation of section 288, subdivision (a) (section 288(a)). The trial court imposed full, consecutive, aggravated terms for each section 220 conviction and stayed the section 288(a) sentences under section 654, for an aggregate sentence of 756 years. Wandrey appealed, challenging in part the trial court's imposition of full and consecutive aggravated terms pursuant to section 667.6.

In *People v. Wandrey* (2022) 80 Cal.App.5th 962, 984 (*Wandrey*), we affirmed the trial court's imposition of full and consecutive terms pursuant to section 667.6 but "remanded for resentencing in light of [the then-newly amended] section 1170, subdivision (b)," which requires imposition of the middle term unless "there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)–(2).)" (*Wandrey*, at p. 981, quoting *People v. Flores* (2022) 75 Cal.App.5th 495, 500.) On remand, the prosecution waived their opportunity to prove factors in aggravation and instead sought a middle term sentence for each section 220 count. The trial court imposed full and consecutive middle terms for each of the 84 sexual assault convictions, totaling 588 years.

Consistent with the background information cited in the parties' appellate briefs and as is set forth below, we incorporate the facts and procedural history recounted in *Wandrey*, *supra*, 80 Cal.App.5th at pp. 967–972.

---

[1] Further undesignated statutory references are to the Penal Code.

## DISCUSSION

### I. The Imposed Sentence Is Not Cruel or Unusual Under Either the California Constitution or the United States Constitution.

The Eighth Amendment to the United States Constitution bans cruel and unusual punishments in order to "guarantee[ ] individuals the right not to be subjected to excessive sanctions" and "flows from the basic ' "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." ' " (*Roper v. Simmons* (2005) 543 U.S. 551, 560, quoting *Atkins v. Virginia* (2002) 536 U.S. 304, 311.) " ' "Article I, section 17, of the California Constitution separately and independently lays down the same prohibition." ' " (*People v. Edwards* (2019) 34 Cal.App.5th 183, 191, quoting *People v. Marshall* (1990) 50 Cal.3d 907, 938, disapproved on other grounds in *People v. Williams* (2024) 17 Cal.5th 99.) In considering whether the U.S. or California Constitution's ban on cruel and unusual punishment has been violated, we review whether a punishment " ' "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235, quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 1042.) The federal and state approaches to cruel and unusual punishment claims largely "overlap," both using " 'gross proportionality' " as their " 'touchstone.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 733 (*Baker*).)

Whether a punishment is cruel or unusual is a question of law, which we review de novo. (*Baker, supra*, 20 Cal.App.5th at p. 722.) The California Supreme Court has described three "analytical techniques" used to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment: "(1) an examination of the nature of the offense and the offender, with particular attention to the degree of danger both pose to society; (2) a comparison of the punishment with the punishment California

3

imposes for more serious offenses; and (3) a comparison of the punishment with that prescribed in other jurisdictions for the same offense." (*In re Palmer* (2021) 10 Cal.5th 959, 973; *People v. Lynch* (1972) 8 Cal.3d 410, 425–428.) The weight afforded each technique varies by case, and " '[d]isproportionality need not be established in all three areas.' " (*Baker*, at p. 723, quoting *People v. Norman* (2003) 109 Cal.App.4th 221, 230.) Deference to the Legislature "is an important element in any disproportionality analysis." (*In re Palmer*, at p. 972.) "Furthermore, great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses." (*Baker*, at p. 729.) Thus, under this framework, "[f]indings of disproportionality are exceedingly rare and occur only in extraordinary cases." (*People v. Wilson* (2020) 56 Cal.App.5th 128, 167.)

When evaluating the nature of an offense, we "consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) We also consider "the particular person before the court, and ask[ ] whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

Starting with the first technique, Wandrey argues disproportionality between the nature of the offense and the offender, emphasizing he had no prior criminal history, and his "interactions with [Jane] Doe had many positive effects." "Doe did not testify" to "being violently attacked or even physically harmed in any way," and "the harm to the victim was . . .

4

significantly less than that produced by other sexual offenses subject to full-and-consecutive sentencing under Section 667.6." In this context, Wandrey contends his case "falls more toward the *Rodriguez* end of the spectrum" (citing *In re Rodriguez* (1975) 14 Cal.3d 639 (*Rodriguez*)) rather than *Baker*, *supra*, 20 Cal.App.5th 711, thus his sentence is cruel and unusual. We disagree.

In *Rodriguez*, the petitioner was ordered released after serving 22 years of an indeterminate, one-year-to-life sentence for a single violation of section 288, which the Supreme Court found constitutionally excessive. (*Rodriguez*, *supra*, 14 Cal.3d at pp. 642–643.) Though "by no means 'trivial,'" petitioner's offense involved no violence, caused no physical harm to the victim, lasted only a few minutes, involved no dangerous weapon, and petitioner did not attempt any "of the dangerous offenses sometimes associated with violations of section 288." (*Id.* at pp. 654–655.) The court further noted: Rodriguez "was only 26 years old at the time of the offense. His conduct was explained in part by his limited intelligence, his frustrations brought on by . . . sexual inadequacy, and his inability to cope with these problems. He had no history of criminal activity apart from problems associated with his sexual maladjustment." (*Id.* at p. 655.)

By contrast, in *Baker*, the Supreme Court upheld a 15-year-to-life sentence for a defendant convicted of one count of oral copulation of his six-year-old niece, in violation of section 288.7, subdivision (b)(7) and two counts of lewd acts in violation of section 288(a). (*Baker*, *supra*, 20 Cal.App.5th at p. 715.) In considering the nature of the offense and offender, the court explained, Baker " 'did not have to hurt her in order to do permanent psychological damage,'" because "lewd conduct 'may have lifelong consequences to the well-being of the child.' [Citation.]" (*Id.* at p. 725.) The victim's comments that "she felt 'disgusting' and kept thinking about what

5

happened, indicat[ed] at least some level of psychological harm." (*Ibid*.) The court further noted factors in aggravation, that the victim was particularly vulnerable given her age and the defendant, her uncle, had abused a position of trust. (*Ibid*.) The court also stated that, "Baker's conduct was egregious"; he committed three sexual acts against the victim within a short period of time; the victim "had to pull a blanket over her face to make him stop"; and the defendant was a mature adult at the time of the offense. (*Ibid*.) Thus, the defendant's insignificant criminal record and no prior history of sex crimes did not outweigh the other factors. (*Ibid*.)

Here, Wandrey's contentions concerning his lack of criminal history, the "nonviolent" nature of the offenses, and his positive influence on Doe present a myopic view that overlooks the totality of the circumstances that far exceeds the severity of both *Baker* and *Rodriguez* and does not negate the seriousness of the convicted offenses.

Doe met Wandrey when he began dating her mother; Doe was nine years old. (*Wandrey*, *supra*, 80 Cal.App.5th at p. 968.) "Doe came to think of Wandrey as a father figure because he paid attention to her, fed her and taught her things like cooking and personal hygiene that her mother, whom Doe described as mentally unstable, had not taught her. Doe was closer with Wandrey than she was with her mother: He treated her as a person instead of a baby, as her mother did, spent more time with her, and gave her more attention." (*Ibid*.) "As Doe got older, Wandrey would ask her about changes in her body. When she was around 10 years old, he asked how large her nipples were . . . ." (*Ibid*.) When Doe was 11 and 12 years old in sixth grade, "Wandrey spent more time with Doe and began to be 'more physical' with her when her mother was not nearby. . . . Wandrey would have Doe sit on his lap while she played computer games; when she sat on his knees, he would tell her it was okay to 'scoot back' and sometimes pull her back with his hands."

6

(*Id.* at p. 969.) Wandrey began to give Doe " 'what he called massages,' which started at Doe's shoulders and 'would evolve to underneath my shirt on my breasts.' " (*Ibid.*) Wandrey told Doe these massages that happened " '[m]any times' " were " 'normal' " and " 'natural,' " and Doe believed Wandrey "because she trusted him." (*Ibid.*) When Doe was 12 years old, Wandrey would touch her chest " '[p]robably three times a week,' but '[i]t could have been less or more.' " (*Ibid.*) Doe agreed that this estimate "would amount to approximately 150 times that year and testified that Wandrey 'definitely' touched her chest 'at least 12 times' that year." (*Ibid.*)

This chest touching " 'evolved' into Wandrey coming into her room and touching her vagina. He would 'start over my underwear by rubbing the top part of my vagina and then he would continue under my underwear and he would put his fingers inside of my vagina repeatedly.' Sometimes Wandrey would touch her legs or 'butt' or back, but he would then move to her vagina." (*Wandrey, supra*, 80 Cal.App.5th at p. 969, fn. omitted.) Doe usually " 'would just freeze,' feeling there was nothing she could do. She felt 'just completely overpowered' because she knew he exercised frequently and practiced martial arts, and she started to become afraid she might get hurt if she did not let him do what he wanted." (*Ibid.*) Doe "estimated that Wandrey touched her vagina at least 100 times during the year she was 12" and " 'definitely' " touched her vagina "at least 12 times" that year. (*Ibid.*)

The " 'massages' " and sexual misconduct continued when Doe was 13 years old. Doe testified that it would be " 'really confusing because I trusted him so much and I didn't want to think that what he was doing was wrong.' " (*Wandrey, supra*, 80 Cal.App.5th at p. 970.) Doe estimated that "Wandrey touched her chest '[m]aybe once a week' when she was 13, but 'definitely' at least 12 times. He touched her vagina three or four times a week: '[W]henever he was home it would happen.' This estimate would mean

7

Wandrey touched Doe's vagina approximately 152 to 208 times the year she was 13.  Doe testified he 'definitely' touched her vagina at least 50 times that year."  (*Ibid.*)

"When Doe was 14, the touching continued and Wandrey started giving her very strong alcoholic drinks, almost always at night before bed. . . .  That year, Wandrey continued to touch Doe's chest, but not as frequently; he continued to touch her vagina 'very frequently,' every time he was home.  She estimated it was more like four times a week than three, and 'definitely' at least 10 times that year."  (*Wandrey*, *supra*, 80 Cal.App.5th at p. 970.)

When Doe was in seventh grade, there were only occasional days when Wandrey did not touch her in a sexual way.  (*Wandrey*, *supra*, 80 Cal.App.5th at p. 970)  "It was hard for Doe to remember 'exactly' how many times the sexual touching happened because 'it was so frequent' and, because the incidents were all 'very similar,' they would 'blur together.'  (*Ibid.*)  On a trip to Hawaii when Doe was 14, "Wandrey gave her a lot of alcohol and marijuana and she was so intoxicated she could 'barely walk,' she 'wholeheartedly' told him to stop touching her.  He showed her his penis, said, 'just one more time' and continued to touch her vagina."  (*Ibid.*)  The touching finally stopped when Wandrey and Doe's mother broke up.  (*Id.* at p. 971.)  When Doe realized what Wandrey had been doing was wrong, she "did not tell anyone because she 'cared about him like as a father' and did not want him to get in trouble."  (*Id.* at p. 970.)

The "absence of violence" shown by this testimony can hardly be considered positive when it paints a detailed picture of Wandrey's grooming and assault of the 11-, 12-, 13-, and 14-year-old Doe, which included escalating misconduct further aggravated by the intentional provision of alcohol and marijuana to the teenage Doe.  In fact, the teaching of hygiene and cooking that Wandrey references as examples of his "positive effects"

were the very interactions Wandrey engaged in to groom Doe for what became at least three years of un-reported assaultive behavior against his girlfriend's child, approximately 30 years his junior. These interactions created a relationship where Doe "trusted him so much" and " 'cared about him like as a father' " which compounded the psychological harm caused by Wandrey's assaults. (*Wandrey*, *supra*, 80 Cal.App.5th at pp. 969–970.) While Wandrey may not have violently attacked Doe, Doe felt " 'completely overpowered' " and was "afraid she might get hurt if she did not let [Wandrey] do what he wanted." (*Id*. at p. 969.) When testifying at trial, Doe, then 19 years old, explained she was " 'very stressed' " being in court because she had " 'to be so close to the source of [her] trauma' " and that the "[m]emories from her childhood were 'on [her] mind all the time' and 'really intrusive.' " (*Id*. at p. 968.)

Similar to *Baker*, the trial court found as aggravating factors that Doe was particularly vulnerable and Wandrey abused his position of trust. (See also Cal. Rules of Court, rule 4.421(a)(3) & (11); *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413 [victim's vulnerability and defendant's abuse of trust were aggravating factors for the offense of forcible lewd acts on a child under 14].) It is incongruous to suggest the psychological harm Wandrey's conduct caused Doe—which included convictions for 84 sexual acts over a period of three years—"does not rise to that which occurred in *Baker*." Accordingly, Wandrey's 588-year sentence is not grossly disproportionate to the nature of the offenses and the offender. (See, e.g., *People v. Panighetti* (2023) 95 Cal.App.5th 978 [280-year-to-life sentence for third striker convicted of nine felonies, including five violent sex crimes]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1231 [135-year-to-life sentence for multiple child molestations]; *People v. Wallace* (1993) 14 Cal.App.4th 651 [sentence of 238 years 8 months for third striker convicted of 46 felonies

9

including rape, forcible penetration by foreign object, and forcible oral copulation); *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531 (*Bestelmeyer*) [129-year sentence for 25 sex crimes against 11-year-old stepdaughter].)

Turning to the second technique used to assess disproportionality, we compare Wandrey's sentence to " 'punishments prescribed in the *same jurisdiction* for *different offenses* which . . . must be deemed more serious.' " (*Baker, supra*, 20 Cal.App.5th at p. 727.) Wandrey contends his convictions under section 220 for assault with the intent to commit certain sexual offenses[2] are in fact equivalent to attempted violations of section 288(a),[3] the willful commission of lewd and lascivious acts upon a child under the age of 14. As such, Wandrey contends he is being punished more severely for less serious "attempts" than for the completed commission of the criminal offenses. Wandrey also argues had he been tried under a theory of continuous sexual abuse of a child under section 288.5,[4] the maximum

_____

[2] Section 220, subdivision (a)(2) provides, "any person who assaults another person under 18 years of age with the intent to commit rape, sodomy, oral copulation, or any violation of Section . . . 288, . . . shall be punished by imprisonment in the state prison for five, seven, or nine years."

[3] Section 288(a) provides, "a person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

[4] Section 288.5, subdivision (a) provides, "Any person who . . . resides in the same home with the minor child . . . , who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct . . . or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual

sentence he could have received was 16 years for the same conduct, rendering the 588-year sentence imposed grossly disproportionate. We disagree.

First, as is set forth in the Penal Code and has been consistently established through caselaw, assaults and attempts are separate criminal offenses. "An assault is an unlawful attempt, *coupled with a present ability*, to commit a violent injury on the person of another." (§ 240, italics added; see also § 664 [establishing punishment for "[e]very person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration"].) "Although the assault statute speaks of an unlawful *attempt*, the crime ' "is not simply an adjunct of some underlying offense [like criminal attempt], but [is] an independent crime statutorily delineated in terms of certain unlawful conduct immediately antecedent to battery." ' " (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 206–207; see also *People v. Pierce* (2002) 104 Cal.App.4th 893, 898 [" 'An assault with intent to commit rape' " is an " 'aggravated form' " of attempted rape "because it is a combination of the elements of attempted rape and assault"], quoting *People v. Holt* (1997) 15 Cal.4th 619, 674 and *People v. Rupp* (1953) 41 Cal.2d 371, 382].) As the applicable jury instruction explains, a section 220 conviction requires proof "[t]he defendant did an act that by its nature would *directly and probably result in the application of force* to a person," and "[w]hen the defendant acted, (he/she) had the *present ability to apply force* to a person" and "intended to commit" a lewd or lascivious act with a child as described in section 288(a). (CALCRIM No. 890, italics added.) In contrast, while an attempt conviction requires an intent to commit the target offense, it only additionally requires "a *direct but ineffective step* toward committing" the

---

abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years."

target offense.  (CALCRIM No. 460, italics added.)  Wandrey's argument that a sexual assault under section 220 is the same as attempted lewd or lascivious act under section 288 simply has no merit.

Second, as noted, we recognize a function of the Legislature is to prescribe criminal punishment; we therefore defer to their determinations, particularly for legislation designed to protect children.  (*Baker*, *supra*, 20 Cal.App.5th at p. 729.)  Both section 220 and section 288(a) are "violent felonies" deserving of enhanced criminal penalties:  "The Legislature finds and declares that the following specified crimes merit special consideration when imposing a sentence to display society's condemnation for these extraordinary crimes of violence against the person."  (§ 667.5, subd. (c)(6) & (15).)

Moreover, the Legislature included section 220 assault violations within section 667.6—but not violations of section 288(a)—requiring the imposition of full and consecutive sentencing terms for each qualifying section 220 conviction.  (§ 667.6, subd. (e)(9); see also *Wandrey*, *supra*, 80 Cal.App.5th at p. 978 ["the Legislature, which deems assault with intent to commit an offense specified in section 220 a 'violent felony' (§ 667.5, subd. (c)(15)), has determined that assaults with intent to commit the sexual offenses included in section 220 warrant punishment under section 667.6].")  Indeed, "the Legislature chose to treat violent sex offense and violent sex offenders differently than other types of offenses and offenders.  In view of the outrageous nature of this type of offense and in view of the danger that these offenses pose to society we cannot say that the imposition of consecutive sentences for multiple sex offenses shocks the conscience and offends fundamental notions of human dignity."  (*Bestelmeyer*, *supra*, 166 Cal.App.3d at p. 531.)  These sentencing schemes demonstrate that the Legislature considers a violation of section 220 to be at least an equally—if not more—

12

serious crime than a violation of section 288(a); it certainly does not equate to the attempted commission of a crime. "We must conclude that the Legislature was well within its constitutional prerogatives when it mandated full-term consecutive sentences for the type of sex crimes we see in this case." (*Bestelmeyer*, at pp. 531–532.)

We therefore turn to Wandrey's argument that his 588-year sentence is grossly disproportionate because he could have received a much shorter sentence if the district attorney prosecuted his case based on a theory of continuous sexual abuse in violation of section 288.5. Section 288.5 defines continuous sexual abuse of a minor under the age of 14 as three or more acts of substantial sexual conduct over a period of time not less than three months in duration. The associated sentence for a conviction is 6, 12, or 16 years in state prison. (§ 288.5, subd. (a).) A defendant cannot be charged with more than one count under section 288.5 unless more than one victim is involved, and no other acts of substantial sexual conduct or lewd and lascivious acts involving the same victim may be charged in the same proceeding as a section 288.5 violation unless the other charged offense occurred outside the time period charged under section 288.5 or the other offense is charged in the alternative. (§ 288.5, subd. (c).) Section 288.5, however, is enumerated within subdivision (e) of section 667.6, authorizing the imposition of full and consecutive terms for such a conviction.

To start, " 'Punishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime. Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual.' " (*Baker*, *supra*, 20 Cal.App.5th at p. 727.) As our Supreme Court has noted, "[e]nacted in 1989, section 288.5 was aimed at solving a recurrent problem in the prosecution of so-called resident child molesters: Because of the age of the

13

victim and the repeated and continual nature of the offenses, trial testimony often failed to identify with specificity the date or place of particular charged acts, and the defense's ability to respond to specific charges arguably was impaired." (*People v. Johnson* (2002) 28 Cal.4th 240, 242 (*Johnson*) [holding that a defendant may not be convicted of a violation of section 288.5 and sexual offenses alleged to have occurred during the same time period against the same victim].)  Thus, to sustain a section 288.5 conviction, "the trier of fact need unanimously agree only that the requisite number of specified sexual acts occurred, not which acts constituted the requisite number." (*Johnson*, at p. 243; § 288.5, subd. (b).)

The enactment of section 288.5—providing a charging alternative in certain types of child sexual assault cases—in no way limits the district attorney's right to make charging decisions based on the circumstances of each criminal case.  (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 451 ["The prosecutor ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek"].)  In fact, "[p]rosecutors in sexual abuse cases possess a variety of means to seek convictions and severe punishments in cases involving sexual offenses against vulnerable young victims.  They may, for example, plead and prove discrete sexual offenses and seek consecutive sentencing when permitted; they may bring a charge of continuous sexual abuse, with its relatively severe range of punishments (§ 288.5, subd. (a)); they may charge continuous sexual abuse and discrete sexual offenses outside the period of the alleged continuous abuse (*People v. Cortes* (1999) 71 Cal.App.4th 62, 80 . . .); in appropriate circumstances, they may plead and prove the allegations required by section 667.61, the 'One Strike' law; or they may charge discrete sexual offenses and continuous sexual abuse in the alternative." (*Johnson*, *supra*, 28 Cal.4th at p. 248.)

14

Here, it was fully within the prerogative of the district attorney to charge and secure convictions for the multiple section 220 offenses. Even if the prosecution had pursued a theory for continuous sexual abuse under section 288.5, they could have still pursued multiple section 220 counts outside of the time frame alleged in the section 288.5 count. (See *Johnson*, *supra*, 28 Cal.4th at p. 248; *People v. Anderson* (2012) 208 Cal.App.4th 851, 889–892 [defendant properly charged with and convicted of one count of section 288.5 and three counts of section 288(a), each covering a different time period].)

"It follows that those who prolong periods of continuous abuse should be more, not less, vulnerable to additional convictions in order to ensure that their punishment can be commensurate with their culpability. Indeed, by permitting prosecutors to seek additional convictions for offenses committed *outside* the alleged period, the Legislature contemplated that a defendant may be convicted of both a course of sexual misconduct and individual sexual offenses against the same victim and thus clearly intended that liability reflect culpability." (*People v. Cortes*, *supra*, 71 Cal.App.4th at p. 78.) The jury convicted Wandrey of committing 84 acts of substantial sexual conduct over a period of three years. His culpability is exponentially greater than a person convicted of three acts over a period of three months under one count of section 288.5. Therefore, Wandrey's theory of disproportionality also fails under the second technique.

Wandrey does not offer any argument or evidence of jurisdictional comparison in support of the third technique, so we do not consider it. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1029.)[5]

---

[5] We do note, however, multiple published authorities and even more unpublished decisions in varied sexual assault cases reject cruel and unusual punishment contentions in favor of upholding sentences that exceed human

15

Having concluded Wandrey's sentence does not violate the California Constitution, we turn to his Eighth Amendment claim. Under the federal approach, we again consider the nature of the offense and offender, the sentences for other crimes in the same jurisdiction, and the sentences imposed for the same crime in other jurisdictions. (*Baker*, *supra*, 20 Cal.App.5th at p. 733.) But our analysis stops if the "threshold comparison" of " 'the gravity of the offense and the severity of the sentence' " does not create "an ' "inference of gross disproportionality." ' " (*Ibid*.) For the same reasons detailed in our above discussion of the potential disproportionality between the nature of the offense and the offender, we find no gross disproportionality violative of the Eighth Amendment and need not proceed further.

## II. The Amended Abstract of Judgment Requires Correction.

We turn next to Wandrey's argument that the amended abstract of judgment requires correction. We agree in part.

---

life expectancy. (See, e.g., *Bestelmeyer*, *supra*, 166 Cal.App.3d at p. 532 ["Consecutive prison terms totaling 129 years imposed as punishment for the commission of 25 separate serious offenses is not cruel or unusual punishment"]; *People v. Retanan*, *supra*, 154 Cal.App.4th 1219 [sentence of 135 years to life for 16 felony convictions and one misdemeanor conviction of sexual offenses against four minors]; *People v. Wallace*, *supra*, 14 Cal.App.4th 651 [sentence of 283 years 8 months for 46 felony and two misdemeanor convictions]; *People v. Panighetti*, *supra*, 95 Cal.App.5th at p. 1002 [sentence of 280 years to life for multiple sexual and non-sexual offenses; " ' "[V]iolent" ' felonies . . . 'merit special consideration when imposing a sentence to display society's condemnation for these extraordinary crimes of violence against the person.' (§ 667.5, subd. (c).) The United States Supreme Court has upheld sentences of life without the possibility of parole for nonviolent crimes, and '[s]ince a sentence of life without parole is not cruel and unusual for certain nonviolent offenses, then, a fortiori, a sentence of [life without parole] is not cruel and unusual for' violent crimes"].)

16

At the original January 2021 sentencing hearing, the trial court awarded Wandrey 905 days of total credit, made up of 787 actual local days and 118 days of conduct credit. At the December 22, 2023 resentencing hearing, the trial court orally pronounced Wandrey's entitlement to 846 actual local days credit plus 1,053 actual days served with the California Department of Corrections and Rehabilitation (CDCR), for a total of 1,899 actual days credit (directing the CDCR to calculate any additional conduct credits). But the amended abstract of judgment, dated December 28, 2023, does not list these updated credits and instead lists the same credits reflected in the 2021 abstract of judgment.[6]

In April 2024, Wandrey submitted a *Fares/Clavel*[7] letter to the trial court, requesting the court correct the amended abstract of judgment to reflect the trial court's oral pronouncement. In response, on June 5, 2024, the trial court further amended the December 2023 abstract of judgment to include 1,899 actual days and maintain the original 118 days of local conduct credit, for a total of 2,017 custody credits. The Attorney General argues the June 2024 amended abstract of judgment is incorrect because the trial court orally pronounced 1,899 total credits, not 2,017, asserting that the 118 days of local custody credit were mistakenly added to the total amount of credits

---

[6] The December 28, 2023, amended abstract of judgment does correctly show the trial court's calculation of actual time credits in section 13: "846 actual (local credits) + 1,053 actual (CDCR credits) = 1,899 actual credits; CDCR to calculate any additional credits"; it is section 15 that contains the inaccurate calculation.

[7] *People v. Fares* (1993) 16 Cal.App.4th 954, 959–960 (urging counsel to attempt correction of error in calculation of custody credits in trial court before "elevating the issue to the stature of a formal appeal"); *People v. Clavel* (2002) 103 Cal.App.4th 516, 519, footnote 4 (clarifying that counsel may submit an informal letter to the trial court to attempt to resolve credit miscalculation).

awarded at resentencing. Noting the trial court's reference to "1,899 actual days credit," we find the trial court's second amended abstract of judgment, dated June 5, 2024, accurately reflects the actual 2,017 days credit for time served—local (118) and with the CDCR (1,899)—as pronounced at the resentencing hearing; the 118 local days have not been double-counted.

Wandrey agrees with the June 2024 credit calculations but contends that the accompanying abstract of judgment fails to clarify the order should have been effective nunc pro tunc as of December 22, 2023, the date of the resentencing hearing. We agree. The abstract of judgment must be amended to correct this clerical omission. (See *People v. Codinha* (2023) 92 Cal.App.5th 976, 984.)

## DISPOSITION

The judgment is affirmed. The trial court is directed to amend the abstract of judgment to include the date of the resentencing hearing, December 22, 2023, in part 15.e. after "Resentencing" to read "Resentencing 12/22/2023." The court is directed to forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

_____
DESAUTELS, J.

We concur:


_____
STEWART, P. J.


_____
MILLER, J.

*People v. Wandrey* (A169657)

19